Filed 2/7/13 (reposted same date to correct "D." to "C." for outline structure on p. 35)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| WYNONA HARRIS, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S181004 |
| v. | ) | |
| | ) | Ct.App. 2/8 B199571 |
| CITY OF SANTA MONICA, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BC341569 |
| _____ | ) | |

A bus driver alleged that she was fired by the City of Santa Monica (the City) because of her pregnancy in violation of the prohibition on sex discrimination in the Fair Employment and Housing Act (FEHA). The City claimed that she had been fired for poor job performance. At trial, the City asked the court to instruct the jury that if it found a mix of discriminatory and legitimate motives, the City could avoid liability by proving that a legitimate motive alone would have led it to make the same decision to fire her. The trial court refused the instruction, and the jury returned a substantial verdict for the employee. The Court of Appeal reversed, holding that the requested instruction was legally correct and that refusal to give it was prejudicial error.

We conclude that the Court of Appeal was correct in part. We hold that under the FEHA, when a jury finds that unlawful discrimination was a substantial factor motivating a termination of employment, and when the employer proves it would have made the same decision absent such discrimination, a court may not award damages, backpay, or

an order of reinstatement. But the employer does not escape liability. In light of the FEHA's express purpose of not only redressing but also preventing and deterring unlawful discrimination in the workplace, the plaintiff in this circumstance could still be awarded, where appropriate, declaratory relief or injunctive relief to stop discriminatory practices. In addition, the plaintiff may be eligible for reasonable attorney's fees and costs. Therefore, we affirm the Court of Appeal's judgment overturning the damages verdict in this case and remand for further proceedings in accordance with the instructions set forth below.

## I.

Santa Monica's city-owned bus service, Big Blue Bus, hired Wynona Harris as a bus driver trainee in October 2004. Shortly into her 40-day training period, Harris had an accident, which the City deemed "preventable." Although no passengers were on her bus and no one was injured, the accident cracked the glass on the bus's back door. When the City hired Harris, it gave her its "Guidelines for Job Performance Evaluation," which said: "Preventable accidents . . . [are] an indication of unsafe driving. . . . [T]hose who drive in an unsafe manner will not pass probation."

In November 2004, Harris successfully completed her training period, and the City promoted her to the position of probationary part-time bus driver. As a probationary driver, Harris was an at-will employee. At some point during her first three-month probationary evaluation period (the record is not clear when), Harris had a second preventable accident in which she sideswiped a parked car and tore off its side mirror. According to Harris, she hit the parked car after swerving to avoid a car that had cut her off in traffic.

On February 18, 2005, Harris reported late to work and received her first "miss-out." The job performance guidelines defined a "miss-out" as a driver's failure to give her supervisor at least one hour's warning that she will not be reporting for her assigned

shift.  The guidelines noted that most drivers get one or two late reports or miss-outs a year, but more than that suggested a driver had a "reliability problem."  The guidelines further provided that a miss-out would result in 25 demerit points  and that "[p]robationary employees are allowed half the points as a permanent full time operator, which is 100 points."

On March 1, 2005, Harris's supervisor gave her a written performance evaluation covering her first three months as a probationary driver from mid-November 2004 to February 14, 2005.  As to Harris's "overall performance rating," her supervisor indicated "further development needed."  Harris testified at trial that her supervisor told her she was doing a good job and would have received a "demonstrates quality performance" rating but for her November accident.

On April 27, 2005, Harris incurred her second miss-out.  She had accompanied her daughter to a juvenile court hearing and failed to timely notify her dispatcher that she would be late for a rescheduled 5:00 p.m. shift.  Harris testified that the stress from her daughter's hearing caused her to forget to notify the dispatcher.  Transit services manager Bob Ayer investigated the circumstances of Harris's miss-out, and on May 4 or 5, 2005, Ayer recommended to his supervisor, the bus company's assistant director, that the miss-out should remain in Harris's file.  Ayer testified that the assistant director asked him to examine Harris's complete personnel file.  He did so and told the assistant director that the file showed Harris was not meeting the city's standards for continued employment because she had two miss-outs and two preventable accidents, and had been evaluated as needing "further development."

On May 12, 2005, Harris had a chance encounter with her supervisor, George Reynoso, as she prepared to begin her shift.  Seeing Harris's uniform shirt hanging loose, Reynoso told her to tuck it in.  Harris confided to Reynoso that she was pregnant.  Harris testified that Reynoso reacted with seeming displeasure at her news, exclaiming:  "Wow.

3

Well, what are you going to do?  How far along are you?"  He then asked her to get a doctor's note clearing her to continue to work.  Four days later, on May 16, Harris gave Reynoso a doctor's note permitting her to work with some limited restrictions.  (Neither party argues the restrictions are relevant to Harris's case.)  The morning Harris gave him the note, Reynoso attended a supervisors' meeting and received a list of probationary drivers who were not meeting standards for continued employment.  Harris was on the list.  Her last day on the job was May 18, 2005.

In October 2005, Harris sued the City, alleging that the City fired her because she was pregnant, a form of sex discrimination.  Answering Harris's complaint, the City denied her allegations and asserted as an affirmative defense that it had legitimate, nondiscriminatory reasons to fire her as an at-will, probationary employee.

The case was tried to a jury.  The City asked the court to instruct the jury with BAJI No. 12.26, which pertained to its mixed-motives defense.  The instruction states: "If you find that the employer's action, which is the subject of plaintiff's claim, was actually motivated by both discriminatory and non-discriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision.  [¶]  An employer may not, however, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision.  Neither may an employer meet its burden by merely showing that at the time of the decision it was motivated only in part by a legitimate reason.  The essential premise of this defense is that a legitimate reason was present, and standing alone, would have induced the employer to make the same decision."

The court refused to give the instruction.  Instead, the jury was instructed according to California Civil Jury Instruction (CACI) No. 2500 that Harris had to prove that her pregnancy was a "motivating factor/reason for the discharge."  "Motivating

4

factor" was further defined according to BAJI No. 12.01.1 as "something that moves the will and induces action even though other matters may have contributed to the taking of the action." By special verdict, the jury found by a vote of nine-to-three that Harris's pregnancy was a motivating reason for the City's decision to discharge her and awarded her $177,905 in damages, of which $150,000 were for "non-economic loss, including mental suffering."

The City moved on multiple grounds for judgment notwithstanding the verdict and a new trial. The City argued, among other things, that the trial court's refusal to give the jury a mixed-motive instruction deprived the City of a legitimate defense. The court rejected this argument. Harris thereafter sought attorney's fees, which the court awarded in the amount of $401,187. (See Gov. Code, § 12965, subd. (b) ["In . . . actions brought under this section, the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs . . . ."].)

Relying on prior Court of Appeal cases as well as federal law interpreting title VII of the Civil Rights Act of 1964 (42 U.S.C § 2000e et seq. (hereafter Title VII)), the Court of Appeal concluded that the requested jury instruction based on BAJI No. 12.26 was an accurate statement of California law and that the refusal to give the instruction was prejudicial error. At the same time, the Court of Appeal determined that there was substantial evidence supporting the jury verdict that Harris had been fired because of pregnancy discrimination. The Court of Appeal therefore remanded for a new trial. We granted Harris's petition for review to decide whether BAJI No. 12.26's mixed-motive instruction is correct.

## II.

California's FEHA provides in pertinent part: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of

5

California:  [¶]  (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, . . . marital status, sex, . . . age, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940 (hereafter section 12940(a)); all further statutory references are to this code unless otherwise indicated.) Elsewhere the statute makes clear that " '[s]ex' includes, but is not limited to, . . . [¶] [p]regnancy . . . [¶] . . . [c]hildbirth, or medical conditions related to [pregnancy or] childbirth." (§ 12926, subd. (q)(1).)

In FEHA employment discrimination cases that do not involve mixed motives, we have adopted the three-stage burden-shifting test established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). As explained in *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317 (*Guz*), a plaintiff has the initial burden to make a prima facie case of discrimination by showing that it is more likely than not that the employer has taken an adverse employment action based on a prohibited criterion. A prima facie case establishes a presumption of discrimination. The employer may rebut the presumption by producing evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer discharges this burden, the presumption of discrimination disappears. The plaintiff must then show that the employer's proffered nondiscriminatory reason was actually a pretext for discrimination, and the plaintiff may offer any other evidence of discriminatory motive. The ultimate burden of persuasion on the issue of discrimination remains with the plaintiff. (See *id.* at pp. 354–356.)

The framework above presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or

legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the "true" reason for the employer's action. In a mixed-motives case, however, there is no single "true" reason for the employer's action. What is the trier of fact to do when it finds that a mix of discriminatory and legitimate reasons motivated the employer's decision? That is the question we face in this case.

Our goal, as in all cases of statutory interpretation, is to give effect to the Legislature's intent. In discerning that intent, we begin with the statutory text.

**A.**

As noted, section 12940(a) prohibits an employer from taking an employment action against a person "because of" the person's race, sex, disability, sexual orientation, or other protected characteristic. The phrase "because of" means there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer. The existence of this causation requirement in the statute is undisputed. What is disputed is the kind or degree of causation required.

Linguistically, the phrase "because of" is susceptible to many possible meanings. The City contends that the phrase "because of" means that an employer's consideration of a protected characteristic must be *necessary* to its decision to take the employment action at issue. This notion of causation is commonly called "but for" causation — that is, the employer would not have taken the action *but for* its consideration of a protected characteristic.

An example of this construction of the phrase "because of" may be found in *Gross v. FBL Financial Services, Inc.* (2009) 557 U.S. 167 (*Gross*). *Gross* involved a dispute over the meaning of the prohibition on adverse employment actions "because of [an] individual's age" in the federal Age Discrimination in Employment Act (ADEA). (29 U.S.C. § 623(a).) The high court said that "the ordinary meaning of the ADEA's

7

requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." (*Gross*, at p. 176.) To establish a violation of the statute, the court held, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." (*Ibid.*)

Our precedent has recognized, however, that "but for" causation is not the only possible meaning of the phrase "because of" in the context of an antidiscrimination statute. In *In re M.S.* (1995) 10 Cal.4th 698, two minors were charged with violating California hate crime statutes that prohibited any person from interfering with the constitutional rights of another " 'because of the other person's race, color, religion, ancestry, national origin, or sexual orientation.' " (*Id.* at p. 706, fn. 1, quoting former Pen. Code, former §§ 422.6, 422.7 (added by Stats. 1987, ch. 1277, § 4, pp. 4546-4747); see *In re M.S.*, at p. 706, fn. 1 [noting that the Legislature later "added gender and disability to the list of protected characteristics"].) In challenging the true findings on the charged offenses, the minors argued that the statutes "must be read to require proof the victim would not have been selected *but for* his or her protected characteristic." (*In re M.S.*, at p. 716.) We did not endorse that view and instead explained that "nothing in the text of the statute suggests the Legislature intended to limit punishment to offenses committed exclusively or even mainly because of the prohibited bias. A number of causes may operate concurrently to produce a given result, none necessarily predominating over the others." (*Id.* at p. 719; see *id.* at p. 716 ["[W]e do not find in the statutes . . . a requirement that the prohibited motivation be the predominant or exclusive cause of the offense."].) Instead, we held that "a crime with multiple concurrent causes is still done 'because of' bias . . . if the prohibited bias was a substantial factor in the commission of the crime." (*Id.* at p. 716.) Our opinion further noted that the "substantial factor" requirement is not met in the case of "a person who entertains in some degree

8

racial, religious or other bias, but whose bias is not what motivated the offense." (*Id.* at p. 719, italics omitted.)

Here, Harris similarly contends that the phrase "because of" in section 12940(a) does not mean that the employer's consideration of a protected characteristic must be the "but for" cause of the disputed employment action. Section 12940(a) does not say that the employment action must be "solely because of," "exclusively because of," or "predominantly because of" improper discrimination. The statute simply says "because of." In interpreting this phrase, however, Harris does not propose the "substantial factor" test stated in *In re M.S.* It is enough, according to Harris, that discrimination was "a motivating factor" in the employer's decision, even if other factors also played a role. As explained below, Harris's view is consistent with the long-standing interpretation of section 12940(a) adopted by the Fair Employment and Housing Commission (FEHC) as well as Congress's understanding of the phrase "because of" when it amended Title VII's prohibition on employment discrimination in 1991.

The discussion above indicates that there are at least three plausible meanings of the phrase "because of" in section 12940(a) — (1) discrimination was a "but for" cause of the employment decision, (2) discrimination was a "substantial factor" in the decision, and (3) discrimination was simply "a motivating factor" — each of which is supported by some authority. When faced with textual ambiguity, we often consult legislative history. But our review of the FEHA's legislative history has uncovered nothing that bears on the kind or degree of causation required by section 12940(a).

Amici curiae California Employment Law Counsel and Employers Group observe that the FEHA's prohibition on housing discrimination includes a provision that says: "A person intends to discriminate if race, color, religion, sex, . . . sexual orientation, marital status, national origin, ancestry, familial status, source of income, . . . [or] disability is a motivating factor in committing a discriminatory housing practice even though other

9

factors may have also motivated the practice." (§ 12955.8, subd. (a).) Amici curiae contend that the Legislature's adoption of the "motivating factor" standard in the context of housing discrimination but not employment discrimination demonstrates its intent to exclude that standard from the FEHA's prohibition on employment discrimination.

It is well-established that " 'negative implications raised by disparate provisions are strongest' when the provisions were 'considered simultaneously when the language raising the implication was inserted.' " (*Gross*, *supra*, 557 U.S. at p. 175, quoting *Lindh v. Murphy* (1997) 521 U.S. 320, 330; see *post*, at p. 16 [discussing simultaneous amendments to Title VII and the ADEA].) In *Richfield Oil Corp. v. Crawford* (1952) 39 Cal.2d 729, 735, the court drew such a negative inference where the disparate provisions "were reenacted together." Similarly, in *People v. Giordano* (2007) 42 Cal.4th 644, 670, the court drew a negative implication in the context of two disparate statutes amended "simultaneously."

Here, by contrast, the Legislature added the "motivating factor" language to the FEHA's housing provisions as part of a 1993 amendment whose sole purpose was to bring California housing law into conformity with federal law. (See *Broadmoor v. San Clemente Homeowners Association* (1994) 25 Cal.App.4th 1, 7–8.) There is no indication that the Legislature, in enacting section 12955.8, subdivision (a), considered the FEHA's employment discrimination provisions or any statutes other than California housing law. (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2244 (1993–1994 Reg. Sess.) Apr. 28, 1993; Assem. Ways & Means Com., Analysis of Assem. Bill No. 2244 (1993–1994 Reg. Sess.) June 2, 1993; Sen. Com. on Judiciary, Rep. on Assem. Bill No. 2244 (1993–1994 Reg. Sess.) Aug. 24, 1993; Sen. Rules Com., Rep. on Assem. Bill No. 2244 (1993–1994 Reg. Sess.) Aug. 24, 1993.) Where a provision "contained in a related statute was added by amendment many years after the enactment of the statute containing no such provision," and where "it is not apparent to us that . . . the Legislature

10

was necessarily concerned with anything beside[s]" the related statute, we have refused to ascribe an intent to the Legislature merely on the basis of negative inference. (*Traverso v. People ex rel. Dept. of Transportation* (1993) 6 Cal.4th 1152, 1166.)

We are left, then, with an ambiguity in the meaning of "because of" in section 12940(a). In the face of this ambiguity, the parties and various amici curiae direct our attention to judicial interpretation of the phrase "because of" as it appears in Title VII. We have said that "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz*, *supra*, 24 Cal.4th at p. 354.) Accordingly, we turn now to consider federal antidiscrimination law, beginning with Title VII and the United States Supreme Court's decision in *Price Waterhouse v. Hopkins* (1989) 490 U.S. 288 (*Price Waterhouse*).

**B.**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." (42 U.S.C. § 2000e-2(a)(1).) In *Price Waterhouse*, the high court observed that the federal courts of appeals were "in disarray" on what kind of causation Title VII requires and who bears the burden of proof in a mixed-motives case. (*Price Waterhouse*, *supra*, 490 U.S. at p. 238, fn. 2.)

At the time, some federal circuits required a plaintiff to prove "but for" causation to establish liability. (See *McQuillen v. Wisconsin Education Assn. Council* (7th Cir. 1987) 830 F.2d 659, 664–665; *Bellissimo v. Westinghouse Electric Corp.* (3d Cir. 1985) 764 F.2d 175, 179.) Other courts held that when a plaintiff has shown that discrimination was a "substantial" or "motivating" factor in an employment decision, the employer can avoid liability by proving it would have made the same decision absent the

11

discrimination. (See *Berl v. Westchester County* (2d Cir. 1988) 849 F.2d 712, 714–715 ("substantial part"); *Fields v. Clark University* (5th Cir. 1987) 817 F.2d 931, 936–937 ("motivating factor").) Still other circuits held that when a plaintiff has shown that discrimination played a discernible part in an employment decision, a same-decision showing by the employer precludes damages and reinstatement remedies but does not provide a defense to liability. (See *Bibbs v. Block* (8th Cir. 1985) 778 F.2d 1318, 1323–1324 (en banc); *Fadhl v. City and County of San Francisco* (9th Cir. 1984) 741 F.2d 1163, 1165–1166.)

In *Price Waterhouse*, the high court resolved this conflict in a splintered decision with six justices agreeing that "when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." (*Price Waterhouse*, *supra*, 490 U.S. at p. 258 (plur. opn. of Brennan, J.); see *id.* at pp. 259–260 (conc. opn. of White, J.); *id.* at p. 276 (conc. opn. of O'Connor, J.).) The principal debate in *Price Waterhouse* concerned the "allocation of the burden of persuasion on the issue of causation." (*Id.* at p. 263 (conc. opn. of O'Connor, J.).) The high court rejected the view that a Title VII plaintiff has the burden of proving "but for" causation. Instead, the court held that once the plaintiff shows that discrimination was a motivating factor, the burden shifts to the defendant to negate "but for" causation by proving that it would have made the same decision at the time even without the discrimination.

In the case before us, the City does not contend that Harris had the burden of proving "but for" causation. Instead, the City argues that the trial court should have instructed the jury: "If you find that the employer's action . . . was actually motivated by both discriminatory and non-discriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone,

12

would have induced it to make the same decision." Thus, the City does not object to the burden-shifting aspect of *Price Waterhouse*. Its primary contention is that we should follow *Price Waterhouse* not only with respect to burden shifting, but also with respect to the legal effect of an employer's same-decision showing. Under *Price Waterhouse*, such a showing by the employer is a complete defense to liability. (*Price Waterhouse*, *supra*, 490 U.S. at p. 242 (plur. opn. of Brennan, J.); *id.* at p. 261, fn. * (conc. opn. of White, J.); *id.* at pp. 261–262 (conc. opn. of O'Connor, J.).)

This latter holding of *Price Waterhouse* was short-lived, however. Two years later, Congress passed the Civil Rights Restoration Act of 1991, which (among other things) codified the rule that an employer's same-decision showing limits the remedies available to a Title VII plaintiff but does not provide a complete defense to liability. Specifically, Congress amended Title VII to provide that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." (42 U.S.C. § 2000e-2(m).) Congress further provided that when an individual "proves a violation" of Title VII and the employer shows it "would have taken the same action in the absence of the impermissible motivating factor," a court can "grant declaratory relief, injunctive relief . . . , and attorney's fees and costs" directly attributable to the Title VII claim but "shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment . . . ." (42 U.S.C. § 2000e–5(g)(2)(B).) These provisions remain in effect today.

The Court of Appeal below said that the 1991 amendments to Title VII have no relevance as an aid to interpreting section 12940(a) because our Legislature has not added any language to the FEHA that parallels the language Congress added to Title VII to codify the "motivating factor" standard of causation. On this view, *Price Waterhouse*'s pre-1991 interpretation of the phrase "because of" to incorporate a same-decision defense

13

to liability — and not Congress's 1991 amendments rejecting such a defense — is the relevant Title VII law that should guide our reading of the phrase "because of" in section 12940(a).

There is no reason to suppose, however, that the Legislature that enacted section 12940(a) in 1980 (Stats. 1980, ch. 992, § 4, p. 3140 et seq.) intended to adopt *Price Waterhouse*'s meaning of "because of." Nor is it accurate to say that Congress's 1991 amendments to Title VII were intended to *change* the original, commonly understood meaning of "because of" in Title VII. The legislative history of the 1991 amendments tell a different story. The United States House of Representatives Education and Labor Committee report said the enactment of 42 U.S.C. § 2000e-2(m), which added the "motivating factor" language, was intended "to *restore* the decisional law in effect in many of the federal circuits prior to the decision in *Price Waterhouse*" — decisions that had interpreted the "because of" language in Title VII to mean that " 'once the trier of fact has found that race was a factor influencing the decision . . . [and] once race is shown to be a causative factor, [the violation is established].' [Citation.]" (H.R. Rep. No. 102-40 pt. 1, 1st Sess. p. 48 (1991).) Similarly, the House Judiciary Committee report said that 42 U.S.C. § 2000e-2(m) "responds to *Price Waterhouse* by *reaffirming* that any reliance on prejudice in making employment decisions is illegal." (H.R. Rep. No. 102-40 pt. 2, 1st Sess., p. 2 (1991), italics added.) The legislative history thus indicates that Congress overruled *Price Waterhouse*'s same-decision defense to liability on the belief that it was *reaffirming* and *restoring*, not revising, the meaning of the phrase "because of" in Title VII's ban on employment discrimination.

The significance of this legislative history is not what it tells us about the original intent of the Congress that enacted Title VII in 1964. (See *Bruesewitz v. Wyeth LLC* (2011) __ U.S. __ [131 S.Ct. 1068, 1081–1082] [post enactment legislative history "is not a legitimate tool of statutory interpretation" because "by definition [it] 'could have had

14

no effect on the congressional vote' "].) Instead, what the legislative history makes clear is that *Congress in 1991* did not understand the phrase "because of" in Title VII to mean what *Price Waterhouse* said it means, and in order to overrule *Price Waterhouse*, Congress wrote its understanding into the statute. The addition of the "motivating factor" language of 42 United States Code section 2000e-2(m) was intended to elaborate and make explicit what Congress believed to be the meaning of the phrase "because of" in Title VII, not to create an entirely new or separate standard of causation. (See *Tyler v. University of Arkansas Board of Trustees* (8th Cir. 2011) 628 F.3d 880, 890 ["Title VII prohibits employers from '[discriminating against any individual] because of such individual's . . . sex.' 42 U.S.C. § 2000e-2(a)(1). Discrimination 'because of' sex occurs when sex is 'a motivating factor for any employment practice, even though other factors also motivated the practice.' 42 U.S.C. § 2000e-2(m)."].) Thus, we do not agree with the City that only *Price Waterhouse*'s interpretation in 1989, and not Congress's understanding in 1991, illuminates what the phrase "because of" means in Title VII or what it must have meant to the Legislature that enacted the FEHA. The history of Title VII does not reveal one "true" meaning of the phrase, but rather different understandings of congressional intent at different times.

This point is underscored by the high court's more recent decision in *Gross*, *supra*, 557 U.S. 167, addressing the meaning of the phrase "because of" in the context of a different antidiscrimination statute. As noted earlier, *Gross* interpreted the Age Discrimination in Employment Act's prohibition on discrimination "because of [an] individual's age" to mean that a plaintiff has the burden of proving "but for" causation. (*Id.* at pp. 176–177.) The high court observed that "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. Moreover, Congress neglected to add such a provision to the ADEA when it amended Title VII to add §§ 2000e-2(m) and 2000e-5(g)(2)(B), even

15

though it contemporaneously amended the ADEA in several ways [citations]." (*Id.* at p. 174.) These textual differences led the high court to conclude that the phrase "because of" in the ADEA should not be construed to incorporate either the "motivating factor" standard of causation or the burden-shifting framework established by *Price Waterhouse*. (*Gross*, *supra*, at pp. 174–175 & fn. 2, 178, fn. 5.) While rejecting the view that " 'motivating factor' claims were already part of Title VII" before 1991 (*id.* at p. 178, fn. 5), *Gross* cast no doubt on the fact that Congress added the "motivating factor" language in order to elucidate, not to alter or supplant, what it believed to be the meaning of the phrase "because of" in Title VII. (See *Staub v. Proctor Hospital* (2011) __ U.S. __ [131 S.Ct. 1186, 1191] ["[Title VII] prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that *such discrimination* is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.' 42 U.S.C. §§ 2000e–2(a), (m)." (italics added)].)

The City contends that because the phrase "because of" appears in both the FEHA and the ADEA without the "motivating factor" language that Congress added to Title VII, the ADEA — and not Title VII — is instructive on the meaning of "because of" in the FEHA. A similar argument underlies the City's contention that *Price Waterhouse*'s pre-1991 construction of the phrase "because of" in Title VII, and not Congress's express definition of the phrase in 1991, should guide our interpretation of the same phrase in the FEHA. However, as *Gross* makes clear, the words "because of," standing alone, do not have a fixed or default meaning in legislative usage. In declining to follow *Price Waterhouse*'s burden-shifting framework, *Gross* observed that the high court in prior cases had not construed the phrase "because of" to have the same meaning in Title VII and the ADEA, thereby confirming that the same phrase can have different meanings in different antidiscrimination statutes. (See *Gross*, *supra*, 557 U.S. at p. 175, fn. 2 ["[T]he

16

Court's approach to interpreting the ADEA in light of Title VII has not been uniform."].) What ultimately matters is legislative intent. Because Congress did not add the "motivating factor" language to the ADEA even as it contemporaneously amended the ADEA in other ways, one can infer — as the high court did in *Gross* — that Congress did not intend the phrase "because of" to have the same meaning in the ADEA as it does in Title VII. (See *Gross*, at pp. 173–175.)

Here, there is no similar basis for inferring what our Legislature intended by the phrase "because of" in section 12940(a). (See *ante*, at pp. 9–10 [explaining why no negative inference can be drawn from the addition of "motivating factor" language to the FEHA's prohibition on housing discrimination].) The fact that the FEHA, unlike the post-1991 version of Title VII, does not expressly define the phrase "because of" establishes the existence of an ambiguity. It does not establish that the default meaning of the phrase is what *Price Waterhouse* said Congress meant by the phrase in Title VII. Although we have often looked to federal antidiscrimination law in interpreting similar language in the FEHA, we have not previously encountered this kind of temporal and cross-statutory variation in Congress's purpose behind a particular provision. Because recourse to federal antidiscrimination law is instructive only to the extent that its purpose and the FEHA's purposes are aligned, we must ultimately focus our attention on what the Legislature said it sought to accomplish in enacting the FEHA. In the end, our interpretation of section 12940(a) must give effect to the Legislature's purpose.

**III.**

In enacting the FEHA, the Legislature spoke at length about its purposes. Section 12920 states: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition,

17

genetic information, marital status, sex, gender, gender identity, gender expression,  age, or sexual orientation.  [¶]  It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for these reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general."

Section 12920 further declares:  "It is the purpose of this part to provide effective remedies that will eliminate these discriminatory practices."  And section 12920.5 provides:  "In order to eliminate discrimination, it is necessary to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons."

In addition, section 12921, subdivision (a) says:  "The opportunity to seek, obtain, and hold employment without discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation is hereby recognized as and declared to be a civil right."  Section 12993, subdivision (a) instructs that the FEHA "shall be construed liberally for the accomplishment of [its] purposes."

In light of these legislatively declared purposes, this court has said:  "The policy that promotes the right to seek and hold employment free of prejudice is fundamental." (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 220 (*Commodore*); see *Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 ["As a matter of public policy, the FEHA recognizes the need to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination. (§ 12920.)"].)  Further, in explaining why sex discrimination in particular violates public policy, we have relied on section 12920 in saying:  "The public policy against sex

18

discrimination and sexual harassment in employment . . . is plainly one that 'inures to the benefit of the public at large rather than to a particular employer or employee.' [Citation.] No extensive discussion is needed to establish the fundamental *public* interest in a workplace free from the pernicious influence of sexism. So long as it exists, we are *all* demeaned." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 90, italics in original.)

Mindful of the FEHA's purposes, we proceed to address what legal consequences flow from an employer's proof that it would have made the same employment decision in the absence of any discrimination. To be clear, when we refer to a same-decision showing, we mean proof that the employer, in the absence of any discrimination, would have made the same decision *at the time it made its actual decision*. (See *Price Waterhouse*, *supra*, 490 U.S. at p. 252 ["proving ' "that the same decision would have been justified . . . is not the same as proving that the same decision would have been made" ' "]; *ibid.* [employer cannot make a same-decision showing "by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision"].)

## A.

We first consider whether a same-decision showing provides a complete defense to liability when a plaintiff has shown that an adverse employment action was motivated at least in part by discrimination. If not, then we must examine whether any relief may be awarded to the plaintiff where the employer shows it would have taken the same action in any event.

No Court of Appeal has squarely addressed these questions, although some have suggested in dicta and without analysis that mixed-motive cases should be analyzed under the *Price Waterhouse* framework. (See *Huffman v. Interstate Brands Cos.* (2004) 121 Cal.App.4th 679, 702–703; *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379.) Significantly, the FEHC, the state agency that until recently

was charged by the Legislature with "establish[ing] a system of published opinions that shall serve as precedent in interpreting and applying the provisions of [the FEHA]" (former § 12935, subd. (h), Stats. 2011, ch. 719, § 175), has long interpreted the phrase "because of" in the FEHA in a manner similar to Congress's 1991 understanding of Title VII's causation requirement. In *Department of Fair Employment and Housing v. Church's Fried Chicken, Inc.* (1990) FEHC Dec. No. 90-11, 1990 WL 312878, the FEHC held that section 12940(a) "deems discriminatory all conduct that is caused in any part by its victim's race or other prohibited basis of discrimination" and that liability is established when "a preponderance of all the evidence demonstrates that the adverse employment action was caused at least in part by a discriminatory motive." (1990 WL at p. *11.) Under the FEHC's interpretation, as under Title VII, a same-decision showing precludes various remedies but does not provide a complete defense to liability. (*Id.* at p. *15.) "We assign great weight to the interpretations an administrative agency like the FEHC gives to the statutes under which it operates, although ultimately statutory interpretation is a question of law the courts must resolve." (*Reno v. Baird* (1998) 18 Cal.4th 640, 660.)

In addressing the issue presented, we begin by drawing a distinction between two related but different purposes of the FEHA noted above. First, the FEHA aims "to provide effective remedies that will . . . redress the adverse effects of [discriminatory] practices on aggrieved persons." (§ 12920.5.) The FEHA recognizes that every individual has a "civil right" to enjoy "[t]he opportunity to seek, obtain, and hold employment without discrimination" (§ 12921, subd. (a)), and when that right is violated, the FEHA seeks to restore aggrieved persons to the position they would have occupied had the discrimination not occurred.

Second, separate and apart from its compensatory purpose, the FEHA aims "to provide effective remedies that will . . . prevent and deter unlawful employment

practices." (§ 12920.5.)  This forward-looking goal of preventing and deterring unlawful discrimination goes beyond the tort-like objective of compensating an aggrieved person for the effects of any wrongs done in an individual case.  It is rooted in the Legislature's express recognition that employment discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general." (§ 12920.)  This broader purpose underlying the FEHA is also reflected in our recognition of "the fundamental *public* interest in a workplace free from the pernicious influence of sexism.  So long as it exists, we are *all* demeaned." (*Rojo v. Kliger*, *supra*, 52 Cal.3d at p. 90, italics in original.)

In light of the FEHA's purposes, especially its goal of preventing and deterring unlawful discrimination, we conclude that a same-decision showing by an employer is not a complete defense to liability when the plaintiff has proven that discrimination on the basis of a protected characteristic was a substantial factor motivating the adverse employment action.  As we explain below, mere discriminatory thoughts or stray remarks are not sufficient to establish liability under the FEHA.  But it would tend to defeat the preventive and deterrent purposes of the FEHA to hold that a same-decision showing entirely absolves an employer of liability when its employment decision was substantially motivated by discrimination.

In considering this issue, it is useful to have in mind the kind of case in which discrimination, though not a "but for" cause of an adverse employment action (because the employer can show it would have taken the same action in any event), might nonetheless be found to be a substantial motivating factor.  The facts of *Price Waterhouse* provide a pertinent example.  (See *Price Waterhouse*, *supra*, 490 U.S. at pp. 232–237.)  Ann Hopkins had worked at Price Waterhouse, a nationwide accounting firm, for five years when the partners in her office put her up for partnership in 1982.  At

the time, there were seven women among the firm's 662 partners, and among the 88 people put up for partnership that year, Hopkins was the only woman. As part of the review process, all of the firm's partners were invited to submit comments on each candidate. The firm's admissions committee reviewed the comments and interviewed the partners who submitted them. Then, for each candidate, the admissions committee issued a recommendation to the firm's policy board to grant partnership, to deny the promotion, or to hold the candidate for possible reconsideration. The policy board then decided whether to submit the candidate to the entire partnership for a vote, to reject the candidate, or to hold the candidate. "The recommendation of the Admissions Committee, and the decision of the Policy Board, [were] not controlled by fixed guidelines . . . . Price Waterhouse place[d] no limit on the number of persons whom it will admit to the partnership in any given year." (*Id.* at pp. 232–233.)

In support of Hopkins's candidacy, the partners in her office submitted a joint statement describing her "outstanding performance" in securing a $25 million contract with the United States Department of State. The federal district court found that " '[n]one of the other partnership candidates at Price Waterhouse that year had a comparable record in terms of successfully securing major contracts for the partnership.' " (*Price Waterhouse*, *supra*, 490 U.S. at p. 234, quoting *Hopkins v. Price Waterhouse* (D.D.C. 1985) 618 F. Supp. 1109, 1112 (*Hopkins*).) The partners in Hopkins's office also praised her as " 'an outstanding professional' " with a " 'deft touch' " and " 'strong character, independence and integrity.' " A State Department official described her as " 'extremely competent, intelligent,' " " 'strong and forthright, very productive, energetic and creative.' " "Another high-ranking official praised [her] decisiveness, broadmindedness, and 'intellectual clarity.' " The federal district court "conclude[d] that Hopkins 'had no difficulty dealing with clients and her clients appear to have been very pleased with her work' and that she 'was generally viewed as a highly

22

competent project leader who worked long hours, pushed vigorously to meet deadlines and demanded much from the multidisciplinary staffs with which she worked.' " (*Price Waterhouse*, at p. 234, quoting *Hopkins*, at pp. 1112–1113.)

"On too many occasions, however, Hopkins' aggressiveness apparently spilled over into abrasiveness. Staff members seem to have borne the brunt of Hopkins' brusqueness. Long before her bid for partnership, partners evaluating her work had counseled her to improve her relations with staff members. Although later evaluations indicate an improvement, Hopkins' perceived shortcomings in this important area eventually doomed her bid for partnership. Virtually all of the partners' negative remarks about Hopkins — even those of partners supporting her — had to do with her 'interpersonal skills.' Both '[s]upporters and opponents of her candidacy,' stressed [the district court], 'indicated that she was sometimes overly aggressive, unduly harsh, difficult to work with and impatient with staff.' " (*Price Waterhouse*, *supra*, 490 U.S. at pp. 234–235, quoting *Hopkins*, *supra*, 618 F. Supp. at p. 1113.)

"There were clear signs, though, that some of the partners reacted negatively to Hopkins' personality because she was a woman. One partner described her as 'macho' . . . ; another suggested that she 'overcompensated for being a woman' . . . ; a third advised her to take 'a course at charm school. . . .' Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only 'because it's a lady using foul language.' Another supporter explained that Hopkins 'ha[d] matured from a tough-talking somewhat masculine hard-nosed mgr to an authoritative, formidable, but much more appealing lady ptr candidate.'. . . But it was the man who, as [the district court] found, bore responsibility for the Policy Board's decision to place her candidacy on hold who delivered the *coup de grace*:  in order to improve her chances for partnership, Thomas Beyer advised, Hopkins should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and

23

wear jewelry.' " (*Price Waterhouse*, *supra*, 490 U.S. at p. 235, quoting *Hopkins*, *supra*, 618 F.Supp. at p. 1117, citations omitted.)  Hopkins's candidacy was put on hold in 1982, and she was not put up for partnership again.

The district court "found that Price Waterhouse legitimately emphasized interpersonal skills in its partnership decisions, and also found that the firm had not fabricated its complaints about Hopkins' interpersonal skills as a pretext for discrimination." (*Price Waterhouse*, *supra*, 490 U.S. at p. 236.)  At the same time, the district court found that Price Waterhouse had "discriminated against Hopkins on the basis of sex by consciously giving credence and effect to partners' comments that resulted from sex stereotyping." (*Id.* at p. 237.)

Another illustrative case in which discrimination could have been found to be a substantial motivating factor in an employment decision, though not necessarily a "but for" cause, is *Rowland v. American General Finance, Inc.* (4th Cir. 2003) 340 F.3d 187 (*American General*).  In 1990, American General, a consumer lending company, hired Anita Rowland as an administrative assistant in its Lynchburg office.  In 1991, George Roach, the director of operations responsible for the company's various district offices, promoted Rowland to branch manager of the Lynchburg office.  In 1994, Roach asked Rowland to transfer to the company's Danville office to turn that office around.  Rowland reluctantly agreed, and under her leadership, the Danville office improved.

Rowland "allege[d] that Rowland promised her that she 'would be the next person to be promoted' to District Manager if she would transfer to Danville.  Although it is not clear exactly what Roach said to Rowland, there is no dispute that Roach did in fact consider Rowland to be a candidate for the position of district manager. . . .  [¶] However, notwithstanding its need to appoint a new district manager on three occasions in 1995, American General never promoted Rowland to that position." (*American General*, *supra*, 340 F.3d at p. 189.)

"Indisputably, Rowland's performance reviews revealed sufficient qualifications for a promotion to the district manager position. Indeed, throughout her employment with American General, Rowland received 'favorable annual performance reviews' and annual merit-based pay increases. Her supervisors generally found that her job performance exceeded standards, that she was extremely dedicated and hard working, and that she comported herself with a high-level of professionalism.

"At the same time, however, Rowland's annual reviews from 1995 and 1996 suggested that she needed to work on her 'people skills.' Moreover, shortly after American General refused to promote Rowland for the third time, Roach received a copy of a written complaint that a customer, who was apparently dissatisfied with the way Rowland had handled his attempt to cancel a loan, had filed with the State Corporation Commission. Upon inquiring into the matter, Roach learned that several employees and former managers felt that Rowland had problems with her 'people skills.' Specifically, Roach learned that Rowland's supposed difficulty in checking her ambitions and her inability to delegate sometimes alienated those who worked with her." (*American General*, *supra*, 340 F.3d at p. 190.)

When Roach met with Rowland in 1996 to explain why she had not been promoted, "he recounted some of the reported problems and suggested that she needed to work on her people skills." (*American General*, *supra*, 340 F.3d at p. 190.) According to Rowland, when she pressed Roach further, "Rowland stated plainly, 'I just don't need another woman in this position, particularly one like Shelby Bennett.' " (*Ibid.*) "[W]hen Rowland had previously voiced her concerns to the same Shelby Bennett, a female district manager at American General, Bennett responded: 'that's just life at American General. That's the way it is. The men run the company, and you just have to do what they say.' " (*Ibid.*)

25

In analyzing these facts, the Fourth Circuit said: "It is possible that Rowland's shortcomings . . . could have provided the sole basis for denying her the promotion she sought. It is also possible, however, that her alleged 'people skills' deficiency constituted part of a larger mix of motivations, including the fact that she was a woman, that collectively drove the decision not to promote her." (*American General*, *supra*, 340 F.3d at p. 193.) The court said that although "Rowland had almost no chance of prevailing" if sex discrimination had to be the "but for" cause of her lack of promotion, the evidence of discrimination "certainly suffices" to support a finding that sex was a motivating factor in the company's refusal to promote Rowland. (*Ibid.*; see *ibid.* ["In sum, Rowland provided evidence that Roach — the supervisor who knew of her qualifications for and interest in the district manager position and who had the power to promote her but did not do so — told her that he did not need any more women in the position that she sought, as well as statements by another female superior suggesting that sex was a 'motivating factor' in employment decisions at American General."].)

As these cases illustrate, to say that discrimination was not the "but for" cause of an employment decision is not to say that discrimination played an insignificant role or that it necessarily played a lesser role than other, nondiscriminatory factors. Indeed, evidence that an employer doesn't " 'need another woman in this position' " (*American General*, *supra*, 340 F.3d at p. 190) or that a company only promotes women who "walk femininely, talk femininely, dress femininely, [and] wear make-up" (*Price-Waterhouse*, *supra*, 490 U.S. at p. 235) may permit the jury to conclude that improper discrimination was a sufficient factor by itself to bring about an employment decision, even if the employer can show that legitimate factors also would have been sufficient, absent the discrimination, to produce the same decision. We do not suggest that discrimination must be alone sufficient to bring about an employment decision in order to constitute a substantial motivating factor. But it is important to recognize that discrimination can be

26

serious, consequential, and even by itself determinative of an employment decision without also being a "but for" cause.

We believe that allowing a same-decision showing to immunize the employer from liability in circumstances like those facing Ann Hopkins and Anita Rowland would tend to defeat the purposes of the FEHA. Whether or not an employee in their respective positions would have been promoted in any event, the existence of facts from which a jury could find that improper bias was a substantial factor motivating the employer's decision is sufficient to establish discriminatory conduct that "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general." (§ 12920.) Such discrimination, even if not a "but for" cause of the disputed employment action, would breed discord and resentment in the workplace if allowed to be committed with impunity.

The FEHA's express purpose of "provid[ing] effective remedies that will . . . prevent and deter unlawful employment practices" (§ 12920.5) suggests that section 12940(a)'s prohibition on discrimination is not limited to instances where discrimination is a "but for" cause of the employment decision. An adverse employment decision substantially corrupted by racial, gender, or other improper discrimination may be indicative of a recurrent policy or practice. A company's practice of sex stereotyping or a supervisor's refusal to promote "another woman" may not be determinative for a particular job applicant, but it may be determinative for a future applicant if left unsanctioned and allowed to persist as a lawful employment practice. We do not believe the Legislature intended to legitimize such practices, and the FEHA does not envision that individuals and the general public must tolerate discriminatory treatment in employment decisionmaking until it finally costs someone a job or promotion. Instead, the Legislature expressly sought to "*prevent* and *deter* unlawful employment practices"

27

(§ 12920.5, italics added) — in other words, to keep unlawful practices from happening in the first place. When discrimination has been shown to be a substantial factor motivating an employment action, a declaration of its illegality serves to prevent that discriminatory practice from becoming a "but for" cause of some other employment action going forward.

Moreover, without such prevention and deterrence, a person in Hopkins's or Rowland's position may well decide against applying for a job, seeking a promotion, or persisting in a training program in view of an employer's demonstrated bias. An uneven playing field tends to discourage people from entering the competition. The understandable reluctance of an individual to submit herself to an employment process that is demonstrably stacked against persons who share her protected characteristic further insulates the employer's discriminatory practice from judicial sanction, while also "depriv[ing] the state of the fullest utilization of its capacities for development and advancement." (§ 12920.) Given the FEHA's statement of its purposes and the harms it sought to address, we cannot ascribe to the Legislature an intent to deem lawful any discriminatory conduct that is not the "but for" cause of an adverse employment action against a particular individual. When a plaintiff has shown that an employment decision has been substantially motivated by discrimination, its harms cannot be assessed solely by reference to its consequences for that individual. As we have said, the public policy against employment discrimination " 'inures to the benefit of the *public at large* rather than to a particular employer or employee.' [Citation.]" (*Rojo v. Kliger*, *supra*, 52 Cal.3d at p. 90, italics added.) It was precisely to address these wide-ranging harms that the Legislature recognized through the FEHA "the fundamental public interest in a workplace free from the pernicious influence of [discrimination]." (*Ibid.*)

28

We are mindful, however, that section 12940(a) does not purport to outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decisionmaking. Racist, sexist, or other biased comments in the workplace may give rise to a claim for unlawful harassment under a separate provision of the FEHA. (§ 12940, subd. (j); see *Lyle v. Warner Bros. Television Productions* (2006) 38 Cal.4th 264, 277–278.) But such comments alone do not support a claim under section 12940(a), nor do bigoted thoughts or beliefs by themselves. Were it otherwise, the causation requirement in section 12940(a) would be eviscerated. Section 12940(a) does not prohibit discrimination "in the air." It prohibits discrimination that causes an employer "to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940(a).)

In *Price Waterhouse*, Justice O'Connor cautioned that neither "stray remarks in the workplace," "statements by nondecisionmakers," nor "statements by decisionmakers unrelated to the decisional process itself" can establish, by themselves, that improper bias was in fact a motivating factor behind a particular employment decision. (*Price Waterhouse*, *supra*, 490 U.S. at p. 277 (conc. opn. of O'Connor, J.).) "Race and gender always 'play a role' in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion. For example, in the context of [*Price Waterhouse*], a mere reference to 'a lady candidate' might show that gender 'played a role' in the decision, but by no means could support a rational factfinder's inference that the decision was made 'because of' sex." (*Ibid.*)

In order to limit the range of evidence from which a rational fact-finder could conclude under Title VII that an employment decision was made "because of" an illegitimate criterion, Justice O'Connor proposed that "a disparate treatment plaintiff must show *by direct evidence* that an illegitimate criterion was a substantial factor in the decision." (*Price Waterhouse*, *supra*, 490 U.S. at p. 276 (conc. opn. of O'Connor, J.), italics added.)  Although a number of federal courts adopted Justice O'Connor's direct evidence standard, it was ultimately rejected in *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90.  We agree with the high court in *Desert Palace, Inc. v. Costa* that the law generally makes no distinction between circumstantial and direct evidence absent some affirmative indication in a statute and that both types of evidence can be persuasive in discrimination cases.  (See *id.* at pp. 99–100.)

Nevertheless, we believe Justice O'Connor's concurring opinion in *Price Waterhouse* was correct to say that "the plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision." (*Price Waterhouse*, *supra*, 490 U.S. at p. 278 (conc. opn. of O'Connor, J.), italics added; see *id.* at p. 277 [concluding that "decisionmakers [in Hopkins's case] placed substantial negative reliance on an illegitimate criterion"].)  Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision.  At the same time, for reasons explained above, proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time.

Given the wide range of scenarios in which mixed-motive cases might arise, we refrain from opining in the abstract on what evidence might be sufficient to show that discrimination was a substantial factor motivating a particular employment decision. In the present case, the jury was instructed under CACI No. 2500 to determine whether discrimination was "a motivating factor/reason" for Harris's termination. We hold that that the jury should instead determine whether discrimination was "a substantial motivating factor/reason," and that the trial court on remand should determine in the first instance whether the evidence of discrimination in Harris's case warrants such an instruction.

**B.**

We turn now to consider the issue of remedies. If a plaintiff has shown that discrimination was a substantial factor motivating a termination decision, but the employer has shown that it would have made the same decision in any event, what relief is available to the plaintiff?

At the outset, we reject Harris's contention that a plaintiff who shows that discrimination was a motivating factor in a termination decision may be entitled to an order of reinstatement or backpay even when the employer proves it would have made the same decision without any discrimination. In the context of an allegedly unlawful termination, an order of reinstatement or backpay would not "redress the adverse effects of [discriminatory] practices on aggrieved persons" (§ 12920.5) if legitimate, nondiscriminatory reasons would have led the employer to terminate the employee in any event. Although such remedies might help to "prevent and deter unlawful employment practices" (*ibid.*), they would do so only at the cost of awarding plaintiffs an unjustified windfall and unduly limiting the freedom of employers to make legitimate employment decisions. Curtailing employers' prerogatives in this way — that is, forcing an employer to retain someone when it had sufficient and legitimate reasons not to do so — would

31

cause inefficiency and would thus tend to "deprive[] the state of the fullest utilization of its capacities for development and advancement," contrary to the FEHA's purposes. (§ 12920.) The same is true with respect to any remedy for economic loss, such as front pay for loss of future income. Such an award would provide the plaintiff with an unjustified windfall.

We come to the same conclusion with respect to noneconomic damages, although the issue is closer. There is no question that an employment decision motivated in substantial part by discrimination inflicts dignitary harm on the affected individual, even if the employer would have made the same decision in the absence of discrimination. The same-decision showing is a hypothetical, counterfactual construct. In mixed-motive cases like *Price Waterhouse* and *American General*, what happened in actuality is that discrimination played a substantial role in the employment decision (or at least a jury could so find), even if discrimination was not a "but for" cause of the decision. For a person in Ann Hopkins's or Anita Rowland's position, the sting of unequal treatment can be quite real even if the challenged employment action would have occurred in any event.

Although we do not doubt the stigmatic harm that discrimination can cause, we are reluctant to find such harm compensable in damages under the FEHA when other, nondiscriminatory factors would have brought about the plaintiff's discharge. Theoretically, it may be possible to distinguish, for example, between a plaintiff's emotional distress resulting specifically from discrimination and the plaintiff's emotional distress resulting from the termination itself. Practically, however, as Harris's counsel conceded at oral argument, it is unrealistic to ask the trier of fact to parse the plaintiff's past mental state so finely and to award *only* the quantum of damages that corresponds to the emotional distress resulting specifically from discrimination rather than the termination itself if the employer makes a same-decision showing. When an employee is fired, and when discrimination has been shown to be a substantial factor but not a "but

32

for" cause, we believe it is a fair supposition that the primary reason for the discharged employee's emotional distress is the discharge itself. Such distress is not compensable under the FEHA — indeed, compensation for such distress would be a windfall to the employee — if the employer proves it would have fired the employee anyway for lawful reasons.

Harris contends that we should not limit noneconomic damages remedies because the FEHA, unlike Title VII, does not and has not historically placed limitations on damages remedies. (See *Peatros v. Bank of America* (2000) 22 Cal.4th 147, 163, 166–167.) But the fact that the FEHA permits "all relief generally available in noncontractual actions" (*Commodore*, *supra*, 32 Cal.3d at p. 221) does not provide authorization to award damages that reflect the significant possibility of a windfall. Of course, the unavailability of noneconomic damages for a termination decision substantially motivated by discrimination does not preclude the possibility of liability in tort for intentional infliction of emotional distress. (See *Agarwal v. Johnson* (1979) 25 Cal.3d 932; *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493.) Emotional distress damages also may be available when an employee is subject to unlawful harassment under the FEHA. (See, e.g., *Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 958–959.) But given the inherent difficulties in disentangling the possible sources of a plaintiff's emotional distress upon being fired, we conclude that a termination decision substantially motivated by discrimination is not compensable in damages under section 12940(a) when an employer makes a same-decision showing.

At the same time, however, the unavailability of damages upon an employer's same-decision showing does not make a finding of unlawful discrimination an empty gesture. Such a finding has several key consequences. First, proof that an adverse employment decision was substantially motivated by discrimination may warrant a judicial declaration of employer wrongdoing. Declaratory relief, where appropriate, may

serve to reaffirm the plaintiff's equal standing among her coworkers and community, and to condemn discriminatory employment policies or practices. (See Code Civ. Proc., § 1060 [a court may make a binding declaration of contested rights and duties].)

Second, upon a finding of unlawful discrimination, a court may grant injunctive relief where appropriate to stop discriminatory practices. (See *Aguilar v. Avis Rent-A-Car System, Inc.* (1999) 21 Cal.4th 121, 131 [courts may grant injunctive relief under the FEHA to prevent discriminatory conduct from recurring]; cf. *EEOC v. Ilona of Hungary* (7th Cir. 1997) 108 F.3d 1569, 1579 [finding unlawful discrimination on the basis of religion under Title VII and upholding injunctive relief "where the individuals who were found to have discriminated remain the defendant's primary decision-makers"].)

Third, when a plaintiff has proven unlawful discrimination, the plaintiff may be eligible for "reasonable attorney's fees and costs." (§ 12965, subd. (b).) Eligibility for attorney's fees fulfills the objectives of the statute for several reasons. An employee who has evidence that she has suffered employment discrimination is often not in the position to assess, at the start of litigation, whether the employer would have made the same decision without the discrimination. As between employer and employee, it may be appropriate that the employer pay reasonable attorney's fees and costs for litigation for which its own wrongdoing has been shown to be substantially responsible. When the employer has made a same-decision showing, an award of reasonable attorney's fees and costs to the plaintiff, unlike an award of damages, carries no risk that the plaintiff will be put in a better position than if she had not suffered any discrimination. Instead, it compensates the plaintiff and her counsel for bringing a meritorious claim of unlawful discrimination.

Moreover, requiring an employer to absorb the costs of litigation for which its own wrongdoing is substantially responsible furthers the FEHA's goal of preventing and deterring unlawful employment practices. As explained earlier (*ante*, at pp. 27–29), the

34

fact that discrimination does not result in compensable injury for a particular plaintiff does not mean that the employer's conduct will not have adverse consequences for other individuals or for society as a whole. A plaintiff's eligibility for reasonable attorney's fees and costs will cause the employer to internalize to some degree the significant social costs of its discrimination, thereby promoting the FEHA's goal of deterring such discrimination.

An award of attorney's fees is discretionary under section 12965, subdivision (b). An award may take into account the scale of the plaintiff's success, and it must not encourage "unnecessary litigation of claims that serve no public purpose either because they have no broad public impact or because they are factually or legally weak." (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1173.) Like Congress in enacting Title VII, our Legislature did not " ' enact[] legislation whose benefit inures primarily to lawyers in the form of a substantial fee recovery, even if relief to the plaintiff is otherwise trivial and the lawsuit promotes few public goals.' " (*Stevens v. Gravette Medical Center Hospital* (W.D.Ark. 1998) 998 F.Supp. 1011, 1018.) The touchstone is "reasonable[ness]." (§ 12965, subd. (b).) In sum, we hold that a plaintiff subject to an adverse employment decision in which discrimination was a substantial motivating factor may be eligible for reasonable attorney's fees and costs expended for the purpose of redressing, preventing, or deterring that discrimination.

## C.

The City cites several cases not involving employment discrimination statutes in support of its contention that an employer's same-decision showing should be a complete defense to liability. In *Bekiaris v. Board of Education* (1972) 6 Cal.3d 575 (*Bekiaris*), a terminated probationary teacher sought reinstatement on the ground that his termination was caused by his exercise of First Amendment rights rather than performance-related reasons alleged by school authorities. We held that if the school board would have

dismissed the teacher notwithstanding its dissatisfaction with the teacher's exercise of constitutional rights, then the dismissal must be upheld. (*Id.* at p. 593.) We said that "we cannot allow a teacher genuinely dismissed for valid causes to be reinstated because school authorities were also displeased with his exercise of constitutional rights," because "were [it] otherwise a teacher about to be dismissed for valid causes could insulate himself from dismissal simply by engaging in political activities offensive to his superiors." (*Id.* at p. 593, fn. 12.)

*Bekiaris* presaged the United States Supreme Court's decision in *Mt. Healthy City Board of Education v. Doyle* (1977) 429 U.S. 274 (*Mt. Healthy*), where a teacher similarly alleged he was discharged for exercising his First Amendment rights and sought reinstatement with backpay. The high court said that once a plaintiff shows that the protected speech was a " 'substantial' " or " 'motivating factor,' " the burden shifts to the employer to show "by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff] even in the absence of the protected conduct." (*Id.* at p. 287.) If the employer makes such a showing, then the dismissal is lawful, and the school board need not rehire the teacher. (*Id.* at pp. 285–286.) The high court explained that the employee should not be put "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." (*Id.* at p. 285.)

In *Williams v. City of Los Angeles* (1988) 47 Cal.3d 195 (*Williams*), a police officer was discharged without receiving proper advisements under the Public Safety Officers Procedural Bill of Rights (§ 3300). Citing *Mt. Healthy* and *Bekiaris*, we held that "reinstatement is not mandated if the employer can demonstrate that it would have reached the same decision even had the employee not engaged in protected conduct." (*Williams*, at p. 205.) In addition, in *Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721 (*Martori Brothers*), a case arising under the

36

Agricultural Labor Relations Act, we considered whether an employee was entitled to reinstatement after being discharged in part because of his union activities and in part because of other factors. The court adopted the test elucidated in *Mt. Healthy* and in a National Labor Relations Board (NLRB) decision, *Wright Line, a Division of Wright Line, Inc.* (1980) 105 L.R.R.M. 1169, 1171–1173. "Under *Wright Line*, once the employee has shown that his union activities were a motivating factor in the employer's decision to discharge him, the burden shifts to the employer to show that discharge would have occurred in any event." (*Martori Brothers*, at p. 730.) "When it is shown that the employee is guilty of misconduct warranting discharge, the discharge should not be deemed an unfair labor practice unless the board determines that the employee would have been retained 'but for' his union membership or his performance of other protected activities." (*Ibid.*; see also *NLRB v. Transportation Management Corp.* (1983) 462 U.S. 393, 401–402, 404 (*Transportation Management*) [finding *Wright Line*'s interpretation of the National Labor Relations Act to be reasonable].)

The City argues that we should follow these cases and hold that an employer's same-decision showing defeats liability under section 12940(a). However, the cases above focused on the unavailability of reinstatement and backpay where such remedies would result in a windfall to the discharged employee. (See *Transportation Management*, *supra*, 462 U.S. at pp. 397–403; *Mt. Healthy*, *supra*, 429 U.S. at pp. 276, 285; *Williams*, *supra*, 47 Cal.3d at pp. 204–205; *Martori Brothers*, *supra*, 29 Cal.3d at pp. 729–730; *Bekiaris*, *supra*, 6 Cal.3d at pp. 580, 592–593.) Our opinion today affirms that reinstatement and backpay are unavailable under the FEHA upon an employer's same-decision showing because a terminated employee should not be put in a better position than she would have occupied had the discrimination not occurred. What the cases above do not hold is that a same-decision showing precludes a finding of unlawful motive that provides a predicate for declaratory or injunctive relief. Indeed, in *Williams*,

even as we held that "the trial court abused its discretion in ordering Williams reinstated" (*Williams*, *supra*, 47 Cal.3d at p. 206), we said "[i]t is uncontested that his rights were violated" under the applicable statute (*id.* at p. 201).

## IV.

We now address a few remaining issues raised by Harris and then summarize our holding in this case.

## A.

Harris argues that if we permit any type of same-decision showing, we should hold the employer to a higher standard of proof. A same-decision defense, Harris contends, must be proven by clear and convincing evidence rather than by a preponderance of the evidence. We reject this view.

The rationale for requiring clear and convincing evidence is similar to the rationale for shifting the burden to the employer to negate "but for" causation upon a showing that discrimination substantially motivated an employment decision. As *Day v. Matthews* (D.C. Cir. 1976) 530 F.2d 1083 explained in the context of Title VII: " 'Unquestionably, it is now impossible for an individual discriminatee to recreate the past with exactitude.' [Citation.] Such a showing is impossible precisely because of the employer's unlawful action; it is only equitable that any resulting uncertainty be resolved against the party whose action gave rise to the problem." (*Id.* at p. 1086, fn. omitted.) In *Price Waterhouse*, however, the high court rejected the clear and convincing standard, noting that exceptions to the preponderance of the evidence standard generally applicable to civil litigation "are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action — action more dramatic than entering an award of money damages or other conventional relief — against an individual." (*Price Waterhouse*, *supra*, 490 U.S. at p. 253 (plur. opn. of Brennan, J.); see *id.* at p. 260 (conc. opn. of White, J.); *id.* at p. 261 (conc. opn. of O'Connor, J.).) As examples, the

38

plurality cited cases involving termination of parental rights, involuntary commitment, deportation, and denaturalization. (*Id.* at p. 253.) The plurality further noted: "Only rarely have we required clear and convincing proof where the action defended against seeks only conventional relief, see, *e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (defamation), and we find it significant that in such cases it was the defendant rather than the plaintiff who sought the elevated standard of proof — suggesting that this standard ordinarily serves as a shield rather than, as [plaintiff] seeks to use it, as a sword." (*Price Waterhouse*, at p. 253.)

In California, we have recognized that " 'the standard of proof may depend upon the "gravity of the consequences that would result from an erroneous determination of the issue involved." ' [Citations.] The default standard of proof in civil cases is the preponderance of the evidence. (Evid. Code, § 115.) . . . [¶] We applied the clear and convincing evidence standard, for example, in *Conservatorship of Valerie N.* [(1985)] 40 Cal.3d 143, 168, to ensure that a conservator's decision to authorize sterilization of a developmentally disabled conservatee was truly in the latter's best interests. We have also applied the clear and convincing evidence standard to findings necessary to terminate parental rights [citation] and to findings supporting the discipline of judges [citations]. The Courts of Appeal have required clear and convincing evidence of a person's inability to provide for his or her personal needs as a prerequisite to the appointment of a conservator [citation], and of a conservatee's incompetence to accept or reject treatment as a prerequisite to permitting involuntary electroconvulsive therapy [citation]." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546, fn. omitted.) We also applied the clear and convincing evidence standard in *Wendland* in the context of a conservator's decision to withdraw nutrition and hydration from a severely disabled conservatee. (*Id.* at p. 524.)

39

But we have not applied a heightened proof standard to cases with ordinary civil remedies, and we are aware of no mixed-motive case since *Price Waterhouse* and the 1991 amendments to Title VII (which also declined to adopt a clear and convincing evidence standard) that has applied anything but a preponderance of the evidence to an employer's same-decision showing.  Harris points to Labor Code section 1102.6, which requires the employer to prove a same-decision defense by clear and convincing evidence when a plaintiff has proven by a preponderance of the evidence that the employer's violation of the whistleblower statute (*id.*, § 1102.5) was a "contributing factor" to the contested employment decision.  Yet the inclusion of the clear and convincing evidence language in one statute does not suggest that the Legislature intended the same standard to apply to other statutes implicating the same-decision defense.  (See *Scientific Cages, Inc. v. Banks* (1978) 81 Cal.App.3d 885, 889 [" '[T]he use of interpretation by reference to analogous but unrelated statutes . . . . is to be used with caution "for the reason that by way of contrast an inclusion or exclusion may show an intent exactly contrary to that expressed by the analogous legislation." ' "].)  Because employment discrimination litigation does not resemble the kind of cases in which we have applied the clear and convincing standard, we hold that preponderance of the evidence is the standard of proof applicable to an employer's same-decision showing.

**B.**

Harris also contends that even if we conclude that a jury should receive some type of same-decision instruction in cases potentially involving mixed motives, the instruction should not have been given here because the same-decision showing was an affirmative defense that the City did not plead in its answer to Harris's complaint.  We hold that the City's failure to plead this defense did not bar such an instruction.

Code of Civil Procedure section 431.30, subdivision (b) provides that an answer to the complaint "shall contain," in addition to a "general or specific denial" of the complaint's allegations, "[a] statement of any new matter constituting a defense." It has long been held that "if the *onus* of proof is thrown upon the defendant, the matter to be proved by him is new matter." (*Piercy v. Sabin* (1858) 10 Cal. 22, 27; see also 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1081, pp. 514–515.) Because the burden is on a defendant to make a same-decision showing, it should plead this defense. In other words, if an employer wishes to assert the defense, it should plead that if it is found that its actions were motivated by both discriminatory and nondiscriminatory reasons, the nondiscriminatory reasons alone would have induced it to make the same decision.

However, "[n]o error or defect in a pleading is to be regarded unless it affects substantial rights." (*Buxbom v. Smith* (1944) 23 Cal.2d 535, 542, citing Code Civ. Proc., § 475.) The primary function of a pleading is to give the other party notice so that it may prepare its case (*Leet v. Union Pac. R.R. Co.* (1944) 25 Cal.2d 605, 619), and a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights. This principle is consistent with the rule that leave to amend a pleading should be liberally granted as long as there is no timeliness problem under a statute of limitations or prejudice to the opposing party. (*Kolani v. Gluska* (1999) 64 Cal.App.4th 402, 412; see also 5 Witkin, Cal. Procedure, *supra*, Pleading, § 1194, pp. 625–627.)

In the present case, the City pleaded in its answer that "[a]ny alleged adverse employment actions of which plaintiff complains . . . were not based on plaintiff's gender and/or sex, pregnancy or any other alleged discriminatory practice, but instead were based on one or more legitimate nondiscriminatory reasons. Nor were any of the employment actions of defendant taken under pretext." This put Harris on notice that the City intended to defend on the basis that it had not discriminated against her and had a legitimate reason for discharging her. The City's defense at trial was consistent with that

41

intention. Harris would not have been prejudiced by an instruction that informed the jury how to arrive at a verdict if the jury partly believed plaintiff's evidence of discrimination and partly believed the City's defense that the discharge was nondiscriminatory. Therefore, the fact that the City did not plead a same-decision defense did not adversely affect Harris's substantial rights, and the omission did not bar the trial court from giving a same-decision instruction.

Harris further argues that for equitable reasons, an employer that wishes to make a same-decision showing must concede that it had mixed motives for taking the adverse employment action instead of denying a discriminatory motive altogether. But there is no inconsistency when an employer argues that its motive for discharging an employee was legitimate, while also arguing, contingently, that if the trier of fact finds a mixture of lawful and unlawful motives, then its lawful motive alone would have led to the discharge. Even if the positions were inconsistent, " ' "[i]t is well settled in California that a defendant may plead as many inconsistent defenses in an answer as she may desire and that such defenses may not be considered as admissions against interest in the action in which the answer was filed." ' " (*Park City Services, Inc. v. Ford Motor Co., Inc.* (2006) 144 Cal.App.4th 295, 309.)

## C.

In sum, we construe section 12940(a) as follows: When a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time. If the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement. However, where appropriate, the plaintiff may be entitled to

42

declaratory or injunctive relief. The plaintiff also may be eligible for an award of reasonable attorney's fees and costs under section 12965, subdivision (b).

In the present case, the trial court gave CACI No. 2500, which required the jury to determine whether discrimination was "a motivating factor/reason" for Harris's termination. The City requested that the jury be instructed pursuant to BAJI No. 12.26: "If you find that the employer's action, which is the subject of plaintiff's claim, was actually motivated by both discriminatory and nondiscriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision. [¶] An employer may not, however, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Neither may an employer meet its burden by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The essential premise of this defense is that a legitimate reason was present, and standing alone, would have induced the employer to make the same decision."

In light of today's decision, a jury in a mixed-motive case alleging unlawful termination should be instructed that it must find the employer's action was substantially motivated by discrimination before the burden shifts to the employer to make a same-decision showing, and that a same-decision showing precludes an award of reinstatement, backpay, or damages. The trial court on remand should determine in the event of a retrial whether the evidence of discrimination in Harris's case warrants a mixed motive instruction.

## CONCLUSION

The judgment of the Court of Appeal overturning the damages verdict is affirmed, and the cause is remanded for further proceedings consistent with this opinion.


LIU, J.


WE CONCUR:*

    CANTIL-SAKAUYE, C. J.
    KENNARD, J.
    WERDEGAR, J.
    CHIN, J.
    CORRIGAN, J.

---

\*     Baxter, J. is recused pursuant to an order filed on January 15, 2013.

44

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Harris v. City of Santa Monica
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 181 Cal.App.4th 1094
**Rehearing Granted**


_____

**Opinion No.** S181004
**Date Filed:** February 7, 2013
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Soussan G. Bruguera


_____

**Counsel:**

Marsha Jones Moutrie, City Attorney, Joseph Lawrence, Assistant City Attorney, Barbara C. Greenstein, Carol Ann Rohr, Jeanette Schachtner, Anthony P. Serritella and Meishya Yang, Deputy City Attorneys, for Defendant and Appellant.

Law Offices of Steven Drapkin, Steven Drapkin; Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., Katherine C. Huibonhoa and Elizabeth MacGregor for California Employment Law Council and Employers Group as Amici Curiae on behalf of Defendant and Appellant.

Melanie Poturica and Morin I. Jacob for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

The deRubertis Law Firm, David M. deRubertis, Michael H. Leb, Kimberly Y. Higgins; Kokozian & Nourmand, The Nourmand Law Firm, Michael Nourmand; Pine & Pine, Norman Pine and Beverly Pine for Plaintiff and Respondent.

Joseph Grodin, Denise Hulett, Claudia Center, Sharon Terman and Tamika Butler for Legal Aid Society-Employment Law Center, American Civil Liberties Union of Northern California, ACLU Foundation of Southern California, American Civil Liberties Union of San Diego and Imperial Counties, California Women's Law Center, Disability Rights Advocates, Disability Rights California, Disability Rights Education and Defense Fund, Inc., Disability Rights Legal Center, Equal Rights Advocates, Impact Fund, Lambda Legal Defense and Education Fund Inc., Mexican American Legal Defense and Education Fund, National Center for Lesbian Rights and Women's Employment Rights Clinic of Golden Gate University School of Law as Amici Curiae on behalf of Plaintiff and Respondent.

Charlotte E. Fishman; Law Office of David J. Duchrow and David Duchrow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Barbara C. Greenstein
Deputy City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
(310) 458-8336

Paul W. Cane, Jr.
Paul, Hastings, Janofsky & Walker
55 Second Street, Twenty-Fourth Floor
San Francisco, CA 94105-3441
(415) 856-7000

David M. deRubertis
The deRubertis Law Firm
4219 Coldwater Canyon Avenue
Studio City, CA 91604
(818) 761-2322