Filed 8/21/15 Baharestani v. ZOLL Circulation CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HOSSEIN BAHARESTANI,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ZOLL CIRCULATION, INC.<br><br>    Defendant and Appellant. | H039028<br>(Santa Clara County<br>Super. Ct. No. 110CV177164) |

Plaintiff Hossein Baharestani, an electrical engineer, was terminated in July 2008 by his employer, defendant ZOLL Circulation, Inc. (ZOLL), a medical device manufacturer. Baharestani had worked as an at-will employee for ZOLL for approximately 21 months. He sued ZOLL for wrongful termination in violation of public policy, pursuant to *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 (*Tameny*). (Hereafter, this claim is sometimes referred to as a *Tameny* claim.) He claimed he was terminated because he refused to submit false or misleading information to the United States Food and Drug Administration (FDA) concerning a ZOLL prototype medical device. A jury found in favor of Baharestani and awarded him $370,000 in lost wages and $130,000 in emotional distress damages.

In its appeal, ZOLL asserts two challenges to the judgment entered on the jury verdict. First, ZOLL contends the court erred when instructing the jury. Specifically,

ZOLL argues that because the evidence potentially supported a finding that there were dual reasons for Baharestani's termination—his refusal to lie to the FDA (according to Baharestani) and his poor job performance (according to ZOLL)—the court erred in refusing to instruct the jury that it was required to find that the former, illegitimate reason "was a motivating or substantial reason" for the termination decision. Instead, the trial court instructed the jury that it could render a verdict for plaintiff if it found the illegitimate reason was simply "a motivating reason" for ZOLL's decision to terminate Baharestani. Second, ZOLL contends the judgment must be reversed because there was insufficient evidence to support the verdict.

Shortly after judgment was entered in this case, the California Supreme Court, in *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*), held that a plaintiff seeking damages in an employment discrimination case must prove that the illegitimate reason was a *substantial* motivating factor or reason in the termination decision— not merely *a* motivating factor or reason. (*Id.* at p. 232.) We thus conclude the court committed instructional error and that this error was prejudicial. Accordingly, we will reverse the judgment and remand the matter for retrial.

PROCEDURAL HISTORY

*I.        Complaint*

Baharestani filed suit on or about July 16, 2010, alleging a single *Tameny* claim (wrongful termination against public policy) against ZOLL. The operative pleading is the unverified first amended complaint (complaint) filed on October 12, 2011, in which Baharestani alleged three causes of action: (1) a *Tameny* claim; (2) a claim of unlawful prevention of employment by misrepresentation, or blacklisting (Lab. Code, § 1050); and (3) intentional interference with prospective economic advantage. Because the trial court granted ZOLL's motion for nonsuit as to the second and third causes of action—an order Baharestani does not challenge on appeal—our focus is solely upon the *Tameny* claim.

2

Baharestani alleged[1] that he was employed by ZOLL from October 30, 2006, to July 18, 2008. ZOLL manufactures AutoPulse, a device intended to provide automated cardiopulmonary resuscitation (CPR) to patients in cardiac arrest.

Baharestani alleged in the complaint that he raised a number of issues involving product safety and the integrity of the testing of proposed ZOLL products. These concerns included questioning the safety of a proposed modification of the AutoPulse design, and his refusal to sign off on a report indicating that defibrillator electrodes had "passed" a compression test in which the AutoPulse had operated for one hour, when the electrodes had, in fact, been damaged during testing. Baharestani alleged that ZOLL retaliated against him for raising these issues. (Baharestani's claims of retaliation are discussed in greater detail in part I.D.1.a. of the Discussion, *post.*) He "was increasingly marginalized" by ZOLL, and he was "left out of project management and instead assigned to increasingly low-level tasks which would keep him away from any information that would allow him to know or comment on the validity of [] the Company's submission to the FDA regarding the modification of AutoPulse." In or about February 2008, ZOLL "began an aggressive campaign to portray [Baharestani] as incompetent and to terminate his employment" by (1) suddenly giving him an evaluation that did not comply with the company's protocols; (2) placing him on a one-month performance improvement plan that contained unrealistic deadlines; and (3) terminating him on July 18, 2008, after he had located a promising job opportunityfor which he had a second interview scheduled the following day.

---

[1] In identifying the allegations of the complaint in this section, we will avoid the repetitive use of the phrase "Baharestani alleged."

## II.    *Trial and Judgment*

The case proceeded to trial before a jury on April 23, 2012.  On May 3, 2012, the jury returned a verdict in favor of Baharestani.  The jury awarded $370,000 in past economic damages and $170,000 for physical pain and mental suffering, for a total damage award of $500,000.  The jury also found that ZOLL had acted with malice oppression or fraud and awarded Baharestani punitive damages of $1.  ZOLL made alternative motions for new trial and for judgment notwithstanding the verdict, which were both denied on September 13, 2012.  Judgment on the jury verdict was entered that same day.

## FACTUAL BACKGROUND[2]

## I.    *ZOLL Circulation, Inc.*

In 2001, James Palazzolo and a vascular surgeon formed Revivant, a start-up company that sought to develop a medical device, ultimately known as AutoPulse, that could assist in giving CPR to patients with cardiac arrest.  AutoPulse became commercially available in 2003, and Revivant changed its name to ZOLL Circulation, Inc. after it was sold to, and became a wholly owned subsidiary of, ZOLL Medical Corporation (ZOLL Medical) in 2004.  When Baharestani was hired in October 2006, ZOLL had approximately 32 employees, 9 of whom were working in research and development (R&D).

AutoPulse is "a CPR assist device" that squeezes the chest to manually circulate blood of a patient experiencing cardiac arrest.  According to Palazollo's testimony, it is a device that provides consistent compressions to assist a person performing manual CPR,

---

[2] A more detailed discussion of evidence relating to ZOLL's contention that the trial court committed prejudicial instructional error is presented in section II.D.1., *post*.

because research has disclosed that manual CPR is so physically taxing that it becomes ineffective after approximately one minute.

The two AutoPulse device modifications under consideration while Baharestani was employed at ZOLL relevant to this dispute are: (1) the AutoPulse pass-thru phase (pass-thru project), and (2) the AutoPulse shock timing phase (shock timing project). The pass-thru project was a modification that connected the AutoPulse with a defibrillator. (The modification did not coordinate the functions of the AutoPulse and the defibrillator.) The shock timing project was a modification in which the electronics of the AutoPulse and the defibrillator were connected in such a way "that they could pass information back and forth." Baharestani testified he was for some period of time in charge of both projects.

## II.    *ZOLL's Hiring of Baharestani*

Baharestani is an electrical engineer/biomedical engineer. He has a Bachelor of Science degree and a Master of Science degree. His professional employment history dates back to 1978. He has worked in research and development for a variety of companies. For the majority of his professional career, Baharestani worked for medical-device companies.

Baharestani was hired in October 2006 by Palazzolo, ZOLL's then-director of R&D. At the time, ZOLL had one R&D electrical engineer, Rick Smith, and Palazzolo thought a second electrical engineer was necessary to develop modifications and improvements to AutoPulse. Palazzolo thought Baharestani had a "fantastic resume," and his experience in the medical device field made him an excellent fit with ZOLL's R&D division.

Baharestani started work at ZOLL as senior electrical engineer on October 30, 2006. Pursuant to an offer letter signed earlier that month, he was to be paid a base salary of $120,000. Baharestani's salary was to be reviewed after six months, and then annually after the first six-month review. It was stated in Baharestani's offer letter that his

5

employment with ZOLL would "be on an 'at will' basis, meaning that either [Baharestani] or [ZOLL] may terminate [Baharestani's] employment at any time for any reason or no reason, without further obligation or liability." Baharestani testified that he understood he was an at-will employee, meaning that "if the company doesn't need [his] skills, [he has] no business there and they have the right to terminate [him]."

Palazzolo was Baharestani's immediate supervisor for a few weeks until Palazzolo left the company. (Palazzolo returned to ZOLL in September 2007 as general manager; later, while Baharestani was still at ZOLL, Palazzolo was elevated to the position of president.) Steve Higa, general manager of ZOLL, then became Baharestani's immediate supervisor. Later, in approximately April 2007, Ryan Shahid was hired by ZOLL as director of product engineering and became Baharestani's immediate supervisor.

### III. *Baharestani's Job Performance and Termination*

Baharestani testified that beginning in fall 2007—after he had raised concerns about the high voltage (HiPot) testing (discussed *post*)—ZOLL started to exclude him from day-to-day operations. Baharestani also noticed that his interactions with ZOLL employees declined after this time in that "people didn't trust [him] with anything" and Shahid made Baharestani do unnecessary editing of work that had previously been approved. He also observed that his work, at the request of Shahid, was subjected to unreasonable monitoring by coworkers.

Baharestani testified he received no evaluations from ZOLL for more than a year after commencing his employment. A written performance appraisal, prepared and signed by Baharestani's supervisor, Shahid, was prepared in March 2008. The appraisal (discussed, *post*) gave Baharestani an "unsatisfactory" performance rating. Baharestani sent Shahid a lengthy response to the performance appraisal.

On March 26, 2008, ZOLL provided Baharestani with a formal performance improvement plan (PIP). Baharestani testified that he thought the tasks listed in the PIP were given unrealistic completion deadlines.

6

Baharestani met for four hours with ZOLL's president (Palazzolo) on April 28, 2008. Palazzolo told Baharestani he wanted him to transition out of ZOLL. According to Palazzolo, he told Baharestani he could have up to two months to find new employment while still working for ZOLL.

On July 18, 2008, after meeting with Shahid and Charlene Shires, ZOLL's human resources officer, Baharestani's employment was formally terminated. Baharestani told Shahid and Shires he had been attempting to arrive at an agreeable transition plan with ZOLL, and that the termination would prevent him from getting a job offer from Zonaire Medical that he thought was forthcoming. Baharestani later appealed directly to Palazzolo to delay his termination so he could attend a second interview with Zonaire without having to disclose that ZOLL had terminated him. Palazzolo declined Baharestani's request.

Baharestani attended a second interview with Zonaire where he disclosed that he had been terminated by ZOLL. He did not receive a job offer. He then conducted daily searches for a new job for three years. He was eventually hired by his present employer, Accuray, on August 29, 2011.

## DISCUSSION

### I. *The Trial Court Committed Instructional Error*

#### A. Instructional Error and Standard of Review

" '[P]arties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented." ' " (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 52-53 (*Freeze*), internal citations omitted.) Viewing the evidence in a light most favorable to the party claiming instructional error

7

applies both to whether there was error and, assuming error, whether such error was prejudicial. (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 655 (*Whiteley*).)

Where instructional error is found, a judgment in a civil case will not be reversed " 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Ibid.*) In assessing whether instructional error is prejudicial, the court looks at "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581, fn. omitted.)

The propriety of a jury instruction is a question of law that is reviewed de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82, citing *People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Likewise, the substance of a special verdict form is subject to de novo review. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)

B.    Background

At trial, the parties submitted different versions of proposed jury instructions relating to the elements of Baharestani's *Tameny* claim. Baharestani submitted an instruction patterned after the then-existing version of California Civil Jury Instruction (CACI) No. 2430 that included as a third element of the claim: "3. That Hossein Baharestani's refusal to participate in providing false or incomplete information to the FDA was a motivating reason for Hossein Baharestani's termination." ZOLL's proposed instruction, also patterned after CACI No. 2430, but containing critical modifications noted here in italics, read as follows: "3. That Baharestani's challenging of ZOLL Circulation's testing procedures was a *motivating or substantial reason* for Baharestani's discharge. *'A "motivating reason" means the reason played a "substantial role" in the*

8

*decision to terminate the employee.'* [Citations.]" (Italics added, original emphasis omitted.) The parties also submitted proposed special verdict forms that were based upon their respective versions of CACI No. 2430: Baharestani's proposed special verdict asked whether his "refusing to participate in providing false or incomplete information to the FDA [was] a motivating reason" for ZOLL's termination decision; ZOLL's proposed special verdict form asked whether Baharestani's "conduct in complaining about ZOLL Circulation's testing practices [was] a substantial or motivating reason" for ZOLL's termination decision. (Original emphasis omitted.)[3]

On May 1, 2012, the court held a conference with counsel concerning proposed jury instructions and special verdict forms. One issue discussed was the parties' respective versions of CACI No. 2430 on the elements of Baharestani's *Tameny* claim. ZOLL's counsel argued that the jury should be instructed that Baharestani was required to show that his conduct concerning product testing was " 'a substantial or motivating reason' " for ZOLL's decision to terminate him. In support of this position, ZOLL cited *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361. The court denied ZOLL's request. Instead, the court instructed the jury that, as the third element of the claim for wrongful discharge in violation of public policy, Baharestani was required to show: "3. That Hossein Baharestani's refusal to participate in providing false or misleading information to the FDA was a motivating reason for Hossein Baharestani's termination." After deliberation, the jury responded "yes" in the special verdict to question 3, as follows: "3. Was Hossein Baharestani's refusing to participate in

---

[3] There is an apparent typographical error in ZOLL's proposed special verdict form in that the question quoted in the text above omits the words "discharge Baharestani" or "terminate Baharestani," and reads " . . . a substantial or motivating reason for ZOLL Circulation's decision to." (Original emphasis omitted.)

providing false or misleading information to the FDA a motivating reason for [ZOLL's] decision to terminate Hossein Baharestani?"[4]

### C.     There Was Instructional Error

Nine months after the trial in this case, the California Supreme Court decided *Harris*, *supra*, 56 Cal.4th 203. In that case, the plaintiff, a bus driver, alleged that she had been terminated by the City of Santa Monica (the City) because she was pregnant, in violation of the prohibitions on gender discrimination provided in the Fair Employment Housing Act (Gov. Code, § 12900 et seq.; FEHA). (*Harris*, at pp. 211, 213.) The plaintiff, originally hired as a driver trainee and promoted one month later to a position as a probationary part-time driver, was terminated after seven months on the job. (*Id.* at pp. 211-213.) The City presented evidence at trial that the plaintiff "was not meeting the city's standards for continued employment because she had two miss-outs [failure to give supervisor at least one-hour's notice that driver would not report for shift] and two preventable accidents, and had been evaluated as needing 'further development.' " (*Id.* at p. 212.) At trial, the City requested that the jury be given a "mixed-motives defense" instruction in which, if the jury found the employer's action to have been motivated by

---

[4] We note a discrepancy in the record concerning the special verdict. The text of question 3 of the special verdict as recited by the clerk on May 3, 2012, when it announced the jury's verdict was as quoted above. But the judgment on jury verdict later entered on September 13, 2012, recites that the jury answered "Yes" to the following question: 3. Was Hossein Baharestani's refusing to participate in providing false or misleading information to the FDA a *substantially* motivating reason for [ZOLL's] decision to terminate Hossein Baharestani?" (Italics added.) We have obtained a copy of the special verdict form filed with the court below on May 4, 2012, to resolve this discrepancy, and we take judicial notice of that document pursuant to Evidence Code section 459, subdivision (a). The language of question 3 of the special verdict form is identical to the language the clerk recited. Accordingly, we conclude the insertion of "substantially" in the judgment's recitation of question 3 of the special verdict was in error.

10

both discriminatory and nondiscriminatory reasons, the employer would not be liable if it established that the legitimate reason, by itself, would have caused it to make the same decision. (*Id.* at p. 213.) The court refused the City's request and instructed the jury, pursuant to CACI No. 2500, that the plaintiff was required "to prove that her pregnancy was a 'motivating factor/reason for the discharge.' " (*Ibid.*) After judgment was entered on a jury verdict in the plaintiff's favor, the City appealed. (*Id.* at pp. 213-214.)

The Court of Appeal reversed and remanded the case, and the Supreme Court affirmed. In holding the instruction at issue in that case (CACI No. 2500) was an inaccurate statement of the law, our high court held that instead of "whether discrimination was 'a motivating factor/reason' for Harris's termination," the proper instruction should have been for "the jury . . . [to] determine whether discrimination was 'a substantial motivating factor/reason' " for her termination. (*Harris*, *supra*, 56 Cal.4th at p. 232.) The court explained: "Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision." (*Ibid.*, original italics.)

After *Harris* was decided, the Judicial Council of California revised four instructions—CACI No. 2430 (wrongful discharge in violation of public policy, essential factual elements), No 2500 (disparate treatment claim under the FEHA, essential factual elements), No. 2505 (retaliation claim under the FEHA, essential factual elements), and No. 2507 ("motivating reason" explained)—to substitute the phrase "a motivating reason" with the phrase "a substantial motivating reason." And CACI No. 2507 was further revised to read as follows: "A 'substantial motivating reason' is a reason that actually contributed to the [adverse employment action]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [adverse employment action]."

11

Two appellate courts—reviewing trial court judgments entered before *Harris* was decided by the Supreme Court—have since concluded that the holding in *Harris* applies not only to claims of discrimination under the FEHA, but also to *Tameny* claims of wrongful discharge in violation of public policy. In *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 469 (*Alamo*), an employee alleged claims for discrimination under the FEHA, retaliation under the FEHA, and wrongful termination in violation of public policy. The *Alamo* court reversed a judgment in the plaintiff's favor, holding that the trial court had prejudicially erred in instructing the jury under the pre-*Harris* versions of CACI Nos. 2430, 2500, 2505, and 2507. (*Id.* at pp. 469-470.) It concluded that under *Harris*, the jury should have been instructed that the plaintiff could prevail on her claims only if she established the alleged unlawful factor was " 'a substantial motivating reason,' " rather than merely " 'a motivating reason' " for her discharge. (*Alamo*, at p. 479.) The court held further that the instructional error—including the error related to CACI No. 2430 concerning the elements of a *Tameny* claim—"was prejudicial because the proper standard of causation in a FEHA discrimination or retaliation claim is not 'a motivating reason,' as stated in the instructions, but rather 'a substantial motivating reason,' as set forth in *Harris*." (*Id.* at p. 483.)

In *Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334 (*Mendoza*), the plaintiff sued for wrongful termination in violation of public policy (a *Tameny* claim), alleging that, after more than 20 years of employment, he had been fired in retaliation for having reported sexual harassment. (*Id.* at pp. 1336, 1338.) The trial court instructed the jury using the pre-*Harris* language of CACI No. 2430, and provided it with a special verdict form consistent with that instruction. (*Id.* at p. 1336.) A jury found in the plaintiff's favor. (*Id.* at p. 1338.) On appeal, the defendants, among other things, asserted that the trial court committed prejudicial instructional error. (*Id.* at p. 1339.) The appellate court agreed. (*Id.* at pp. 1339-1342.) It cited *Harris*, *supra*, 56

12

Cal.4th at page 232, noting that at least with respect to CACI No. 2500 (disparate treatment claim under the FEHA), the proper instruction should read that the unlawful factor was " 'a *substantial* motivating factor, rather than simply *a* motivating factor' " in the employer's termination decision. (*Mendoza*, at p. 1341.) The *Mendoza* court noted further that the Judicial Council had impliedly concluded that CACI No. 2430 was also incorrect when it modified the instruction in 2013 to provide that a plaintiff asserting a *Tameny* claim must show that the improper factor was " 'a substantial motivating reason' " for the termination decision. (*Id.* at p. 1340.) And the *Mendoza* court relied on *Alamo*, *supra*, 219 Cal.App.4th 466 to conclude that the *Harris* standard applied to *Tameny* claims as well as FEHA claims: "It would be nonsensical to provide a different standard of causation in FEHA cases and common law tort cases based on public policies encompassed by FEHA." (*Mendoza*, at p. 1341.)

We agree with the holdings in *Alamo*, *supra*, 219 Cal.App.4th 466, and *Mendoza*, *supra*, 222 Cal.App.4th 1334. We, too, hold that the "substantial motivating factor/reason" language enunciated by the California Supreme Court in *Harris* as the causation standard in a FEHA case is equally applicable to common law *Tameny* claims for wrongful termination in violation of public policy. (*Mendoza*, at p. 1341.)

Baharastani urges that the differences between the pre-*Harris* instruction given and the post-*Harris* "substantial motivating reason" instruction recommended by the Judicial Council its revision to CACI No. 2430 are not "so drastic as to warrant reversal." But, he argues, were we to disagree with his position, we should not apply *Harris* retroactively in this case.

"Courts of Appeal routinely consider newly published case law that was not available until after entry of judgment in the trial court." (*Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 23 (*Waller*); see also *Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1713, fn. 9 [retroactivity doctrine applies "to all cases still open on direct review and to all events, regardless of whether such events

13

predate or postdate announcement of the rule."].)  Although judicial decisions will sometimes be construed to apply only prospectively, this will only be done when there are "compelling and unusual circumstances justifying departure from the general rule." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 983 (*Newman*); see also *UDC-Universal Development, L.P. v. CH2M Hill* (2010) 181 Cal.App.4th 10, 22 [noting that courts have "repeatedly rejected claims that new case law should not be applied retroactively"].)  Contrary to Baharestani's assertion—relying in part on *Newman*—this is not an instance warranting an exception to the general rule of retroactivity, such as " 'where a . . . statute has received a given construction by a court of last resort, and contracts have been made or property rights acquired in accordance with the prior decision, [such that] the contracts should not]be invalidated nor vested rights be impaired by applying the new rule retroactively.  [Citation.]' [Citation]" (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305.)  Thus, we conclude the California Supreme Court's articulation in *Harris* of a heightened standard of causation applies to this case.  (*Waller*, *supra*, 11 Cal.4th at pp. 23-25; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1334-1335.)[5]

        D.     The Error Was Prejudicial

In determining whether the instructional error was prejudicial, we follow the four-prong inquiry enunciated by the California Supreme Court, giving consideration to "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at pp. 580-581, fn. omitted.)

---

[5] We note that in *Alamo*, *supra*, 219 Cal.App.4th 466 and *Mendoza*, *supra*, 222 Cal.App.4th 1334, the appellate courts applied *Harris* retroactively under procedural circumstances similar to those here.

14

### 1. State of the Evidence

The evidence relating to Baharestani's employment with ZOLL was in great conflict. The evidence favoring Baharestani's claim that he was terminated in violation of public policy, and ZOLL's evidence supporting its position that he was terminated for poor performance, is outlined below.

#### a. Evidence Favorable to Baharestani's *Tameny* Claim

Baharestani presented a significant amount of evidence that he had raised six issues surrounding the integrity of the testing and the safety of products for which ZOLL was seeking FDA approval. The theme argued by his counsel to the jury was one of action-reaction (i.e., Baharestani would complain about safety or testing issues and, in response, ZOLL would take negative action towards him).

First, Baharestani presented evidence that he complained to ZOLL that the pass-thru device added risk without creating benefit. He claimed that after he complained in March 2007 and was told he could study the possibility of proceeding with the shock timing device without a delay in the approval process, he was removed prematurely from the shock timing project and it was given to another engineer.

Second, Baharestani testified that he advised management about a potential flaw in HiPot testing involving a false "pass" of the testing where the cable may have been disconnected or broken. He testified that after doing so and after submitting testing specifications to address the problem, the project was reassigned to a new engineer who eliminated the safeguards Baharestani had developed for the specifications. Later, in September 2007, the testing protocol was again modified to address Baharestani's concern by providing for the test to fail if the cables were not connected.

Third, Baharestani testified that he advised his superiors that the user guide for the proposed pass-thru device incorrectly stated that all ZOLL Medical defibrillator cables were compatible with ZOLL's device. Baharestani did not identify a specific "reaction"

15

to this complaint. Indeed, ZOLL followed the recommendation in Baharestani's memorandum to narrow the list of electrodes compatible with the AutoPulse.

Fourth, Baharestani investigated the appropriate sample size for defibrillator electrodes that would be subject to compression testing—i.e., testing in which there would be compressions of the AutoPulse (simulated administration of CPR on a patient) to determine whether defibrillator electrodes would be damaged. After relaying information he had received from BioDetek (ZOLL's sister company that manufactured defibrillator cables) that 30 electrodes was a good sample size, Baharestani's superior ridiculed that suggestion in an email. Baharestani testified he then started to explore the possibility of a smaller sample size, but was removed from the compression test project before he could complete his analysis.

Fifth, in August 2007, protocols for compression testing of defibrillator electrodes for the pass-thru project were developed by another ZOLL electrical engineer, Rick Smith. Under that protocol, the electrodes were required to undergo 60 minutes of compression testing without physical damage that would affect their functionality. Baharestani performed the 60-minute compression test, after which a BioDetek employee reported back to him that one of the electrodes had failed in that it was unable to deliver the required number of shocks. Baharestani testified that he and Smith had agreed the electrode had failed, but Shahid said, angrily, the electrodes had passed the test and told him " ['N]o. Sign it off as a pass.[,] " Later, Baharestani asked if he could take a day to investigate why the electrode had failed. Shahid agreed to give him a day for the investigation. But Baharestani testified that before he could complete the investigation, Higa told him he had spoken to BioDetek's president and there would be a compromise in which it would be said the electrodes had passed the compression test but ZOLL would "not use the results as intended." The report was then revised to indicate that the electrodes had passed a 30-minute compression test. Baharestani testified that he had disagreed with that conclusion because the electrode had failed after 60 minutes of

16

compression and there was no way of determining at what time (i.e., before or after 30 minutes) the electrode had failed. Baharestani ultimately signed the final test report, which had indicated that BioDetek (not ZOLL) had concluded that the electrodes had passed a 30-minute compression test. But he thought the final test report reflected very poor engineering judgment.

Higa testified that Baharestani had done the right thing by telling Shahid he would not sign the test results as indicating the electrodes had passed 60 minutes of compression testing. But Higa also testified that the electrodes were in fact still functional after one hour of testing, although they showed wear. He was advised by BioDetek that all electrodes worked after the testing, so it was a pass. But BioDetek raised concerns about some cracking and mechanical wear with the electrodes, so it suggested the run-time of the AutoPulse with pass-thru be limited to thirty minutes, which was the average amount of time AutoPulse was deployed on a patient. Palazzolo likewise testified that the electrodes were still functional after one hour of compression testing. Palazollo also testified that, based upon feedback from the FDA while the application for approval of the pass-thru device was pending, ZOLL performed additional compression tests that more closely simulated how the AutoPulse would likely be used in the field with a defibrillator. The new tests showed that the electrodes were functional for as long as 20 hours of chest compression and shocks, although some failed at three hours.

Sixth, in October 2007, Baharestani attended a meeting in which there was a discussion that the maximum voltage from a ZOLL Medical defibrillator was 4.4 kilovolts, instead of 3.6 kilovolts, as ZOLL had been advised previously by ZOLL Medical. ZOLL had spent a significant amount of time performing HiPot testing for the pass-thru project to make sure the AutoPulse could work safely with the defibrillator. The HiPot testing used 1.5 times the maximum voltage of the ZOLL Medical defibrillator. This protocol of 1.5 times maximum voltage is a standard used by ZOLL. Baharestani testified the protocol "has a significant role in the FDA's evaluation of

17

[ZOLL's] claims and [its] application for a new product." Because of the incorrect information from ZOLL Medical, ZOLL did not test to a level of 6.6 kilovolts (1.5 times the maximum of 4.4 kilovolts of ZOLL Medical's defibrillators); rather, Baharestani followed the protocol of using a maximum of 6.0 kilovolts. Baharastani testified that in a meeting in October 2007, Ziad Elghazzawi, a representative of ZOLL Medical, stated that he thought the testing was "probably okay, and Mr. Ryan Shahid seem[ed] to agree with that." Baharestani disagreed, saying that ZOLL's standard specifically required 1.5 times the maximum voltage, so ZOLL was required to perform the test at that standard. ZOLL subsequently duplicated the HiPot testing using the correct 4.4 kilovolts as the maximum voltage, after Baharestani amended the specification, design and protocol documents. The new testing delayed the project by at least two months.

Baharestani testified that beginning in fall 2007 (after he had raised concerns about the HiPot voltage testing), he noticed that he started being excluded from day-to-day operations. He said Shahid expressed resentment at having to perform the retesting, referring to the issue at staff meetings as "the Hi Pot fiasco." He also noticed that his interactions with ZOLL employees had declined in that "people didn't trust [him] with anything" and Shahid made him do unnecessary editing of work that had previously been approved. He also observed that his work was being subjected to unreasonable monitoring by coworkers at the request of Shahid.

b.      Evidence of Poor Job Performance

Evidence concerning Baharestani's job performance, and whether he was counseled by ZOLL management about perceived deficiencies, was in sharp conflict. Although Baharestani testified he had no performance reviews until March 2008 and that he thought his job performance was satisfactory, ZOLL presented a great deal of

18

evidence that Baharestani's job performance was substandard and that at least three of his supervisors counseled him on an ongoing basis.[6]

Higa—Baharestani's supervisor between December 2006 and April 2007—testified that the pass-thru project was delayed due to Baharestani's lack of a clear understanding of AutoPulse. During the time Higa supervised Baharestani, he (Higa) felt Baharestani's productivity was too low and that he "was struggling." In that time period, Higa met with Baharestani after meetings and at the end of the day to coach and mentor him on matters Higa observed Baharestani was having difficulty with. Higa recalled one instance in March or April 2007 when Baharestani developed a schedule for the pass-thru device that was not realistic because it ran seven different schedules serially, rather than determining when different functions could be scheduled to run in parallel fashion. Higa advised Baharestani he needed to better coordinate the overall schedule of the project.

According to Higa, in approximately April 2007, Baharestani asked Higa if he would be receiving a formal six-month performance review. Higa said his performance did not warrant a merit salary increase and he had "some issues we need to work through." Higa suggested that since Shahid had been hired and would take over as Baharestani's supervisor, it might make sense to defer the review to permit Baharestani and Shahid to work together.

Higa testified that he met with Baharestani in May 2007 and gave him a verbal performance review that was not documented. In that review, Higa told Baharestani his work "needed improvement, especially with regard to Baharestani's inability to get tasks completed and [his] inability to work cooperatively with his peers." Also in May 2007, because Baharestani's work was delayed, Higa reassigned the HiPot testing for the pass-

---

[6] Shahid did not testify in person at trial. Excerpts of Shahid's videotaped deposition were played at trial by ZOLL's counsel in the presentation of its defense. The parties have provided us with no record of this videotaped deposition testimony.

thru project to another employee. Higa testified that Baharestani had done some of the planning work for the HiPot testing, but the work was "very straightforward," "upfront work" that represented only about 30 percent of the planning work needed.

Baharestani acknowledged on cross-examination that sometime after April 2007 when Shahid was hired, Baharestani was concerned about whether he still had a role in the company, and he started looking for another job shortly thereafter. Baharestani testified he had a discussion in July 2007 with Higa in which he offered to resign because a project Baharestani had managed had been transferred to Shahid, and Baharestani felt he "was being marginalized." Baharestani told Higa that he did not "want to be a burden on the company," and that he and Higa "couldn't see eye to eye on the projects." After Baharestani offered to resign, Higa told him, "[N]o, that's not how we deal with people in this organization. We work with them."

Palazzolo also testified that in the fall and winter of 2007, he spoke approximately weekly with Baharestani about ways to improve his job performance. He talked to Baharestani about his interactions and communications with others, and working in a team setting. Palazzolo advised Baharestani that he could establish better relationships and more effectively communicate with others by "spend[ing] less time e-mailing the person two feet away and spend[ing] more time talking to [the person]." Palazzolo also talked to Shahid and suggested he find ways to assist Baharestani in coming up with methods of working within ZOLL's research and development culture.

Palazzolo testified that as of the end of January 2008, after talking with and coaching Baharestani for three months, "he was struggling to meet deadlines, . . . the interpersonal interactions with other engineers on the team weren't as fruitful as they should be[,] and he wasn't as engaged in the team process as he should be." Palazzolo had multiple conversations with Shahid in January-February 2008 about Baharestani's performance. Shahid had discussed Baharestani's performance with Palazzolo and had said that it "wasn't where he expected it to be." Shahid wanted to give Baharestani a

performance review, but Palazzolo suggested that Shahid defer it and instead "have an intensive period where [Shahid and Palazzolo] . . . work[ed] with [Baharestani] to try to get his performance to improve." Between late January and March 2008, Palazzolo and Shahid continued to talk and confirmed what efforts they were taking to coach Baharestani. After some time, neither saw progress, and they decided that Shahid should move forward with the performance appraisal.

Finally, three of Baharestani's coworkers—Rick Smith, Craig Pendry, and Sean Yip—testified that from their observation, there were problems with Baharestani's job performance. Smith felt that Baharestani "was not performing all of his work." Pendry testified that, as of March 2007, he did not believe Baharestani had a good grasp of the pass-thru project and he was late in completing some tasks. Pendry also observed that in 2007, Baharestani "had put together things that were very complicated and hard to understand." Yip—who was asked by Shahid in February 2008 for input concerning Baharestani's job performance—indicated in an email that he believed Baharestani "could design circuits, but someone else has to give him top-level design first. If he only has high-level functional requirements, his design tends to be much more complicated than necessary and may not even meet the requirements." Yip also stated that Baharestani had "yet to deliver a single task on-time" for the AIT project. He wrote that the AIT circuit was four months overdue. Yip also indicated that Baharestani "seem[ed] to have trouble understanding others." And under the heading "Teamwork," Yip described Baharestani as "among the most difficult people I've worked with. Most of all, he's paranoid."

c.      Performance Review & Termination

In contrast to Higa's testimony that Baharestani was given a verbal review in May 2007, Baharestani testified he received no evaluations from ZOLL for more than a year after commencing his employment. Baharestani testified that in approximately January 2008, Baharestani approached Shahid to request an evaluation. Shahid said "it would be

21

done." Months later, Baharestani spoke with Shahid, who said he had been considering conducting a review, but Baharestani "should maybe consider other options because it [(a review)] was not going to be good." Approximately two days later, Shahid told Baharestani there would "be a review, no other options," and Baharestani asked for a few days to prepare for the review. Shortly afterward, Shahid performed the employee review.

On March 7, 2008, Shahid signed the performance appraisal, and Baharestani signed it on March 14, 2008. The appraisal covered the period from October 30, 2006, to October 30, 2007. Higa and Palazzolo reviewed the appraisal and provided their input. The appraisal was done in March 2008, according to Higa, because "we had determined after trying to find a role that would work that there really wasn't a role [Baharestani] could perform in and be successful at ZOLL Circulation." The ultimate conclusion of the appraisal was that "[Baharestani's] performance in the last review period had not been up to a level to meet the performance and productivity level of senior electrical engineer at ZOLL Circulation." He was given an "unsatisfactory" performance rating.

Shahid stated in the appraisal that Baharestani had "missed most of his goals in the last review period and continues to struggle in coming up to speed with the AutoPulse system details. [Baharestani was] for a period of time lead [on] the [pass-thru project]. The project was not going well and had issues with the progress and the overall project management." Shahid also stated: "[Baharestani] worked on various projects . . . and seemed to have put in a lot of hours working on those projects. However, his output did not match the apparent level of effort . . . He did not deliver results consistently and on time and something always seems to get in the way. He seems to frustrate team members by raising issues and concerns that cripple progress but are without demonstrated merit. He then tends to approach them for solutions to problems which often appear to have been made overly complex. [¶ Baharestani] has shown poor skills in the area of managing and measuring work. [He] made commitments for specific deliverables and

22

then missed the deadline completely without timely update to team members." Shahid went on to state: "[Baharestani] has limited grasp of due process as seen by others which can cause disruption in overall team productivity. [Baharestani] appears to work in a disorganized fashion and cannot figure out effective and efficient ways to get things done."

On March 19, 2008, Baharestani sent Shahid (with a copy to ZOLL's president, Palazzolo) a written, 11-page response to the performance appraisal. At the time, Baharestani believed ZOLL was attempting to get rid of him because the pass-thru project had been completed. Based upon the negative performance appraisal, Baharestani asked, among other things, why no one at ZOLL had ever "formally coached, counseled, or warned" him previously.

After receiving Baharestani's response to the performance appraisal, Palazzolo asked Higa and Shahid to review it in detail on a high priority basis. He wanted the review made a priority, in part, so that Palazzolo could learn whether Baharestani's response raised any specific issues about product safety that needed to be addressed. Higa and Shahid prepared a document rebutting Baharestani's response, which was finalized after Palazzolo's review. Palazzolo concluded that Baharestani's response did not raise any significant allegations about product safety that needed to be addressed, and the response "was largely that he was unhappy about [having] received an unsatisfactory performance review and that he was looking for ways to blame that performance on things other than himself."

On March 26, 2008, Shahid, on behalf of ZOLL, provided Baharestani with a formal performance improvement plan (PIP). Palazzolo reviewed the PIP and discussed it with Shahid before it was provided to Baharestani. The intended approach was to provide Baharestani with some tasks that were easy to accomplish in order to give him some early success. For instance, Palazzolo felt that the first task listed on the PIP— modifying the HiPot tester for the shock timing device—was very achievable, given

23

Baharestani's familiarity with the HiPot tester and the fact that the work was "nearly completed." Palazzolo believed that the due dates for each of the three tasks listed in the PIP were achievable. But Baharestani testified that each of the three tasks listed in the PIP were assigned unrealistic completion deadlines, and on April 10, 2008, Baharestani provided a written response to the PIP so indicating.

Palazzolo testified that Baharestani missed each of the target completion dates for the three tasks, and that he had missed them "by a wide margin." As a result of Baharestani's performance under the PIP, Palazzolo decided to terminate Baharestani's employment. Palazzolo met with Baharestani for four hours on the evening of April 28, 2008, and notified Baharestani that he wanted to help him successfully transition from ZOLL to another company. He offered to continue to employ Baharestani for two months while Baharestani actively looked for other employment. He told Baharestani that he could attend interviews during normal working hours. He offered to review Baharestani's resume and give him feedback. Palazzolo also offered to give Baharestani's resume to friends in the medical device field. Palazzolo testified that Baharestani's raising concerns about product safety issues had no bearing on his decision to terminate him. Palazzolo also testified that he believed Baharestani was not a good fit within the culture of ZOLL. He felt Baharestani was "a capable engineer" and he would be happier if he could find a better fit with a company that had a more narrowly defined job scope than he had with ZOLL.

The next day (April 29, 2008), Baharestani sent Palazzolo an email in which he thanked Palazzolo for the time spent " 'discuss[ing] alternatives that may be used to resolve the current disagreements.' " Palazzolo testified that he had not proposed "alternatives" but had made it clear that Baharestani was being terminated with two months to transition from ZOLL. Palazzolo testified he "was flabbergasted" by the email in that it proposed that ZOLL pay him through August 31, 2008, a period much longer than two months. Palazzolo met with Baharestani on April 29, 2008, and told him that

24

the August 31 date was not consistent with their discussion, and that he would have a maximum of two months to find other employment. Palazzolo did not document this conversation.

Palazzolo testified that he decided to move forward with Baharestani's termination in early July 2008. He did so after speaking with Baharestani and asking him how his job search was progressing. Baharestani indicated he was struggling to find any job opportunities and had not had any interviews. Palazzolo concluded from this meeting that Baharestani was not actively looking for work. Palazzolo testified that at no time had Baharestani approached him to ask him for comments about his resume or to forward it to anyone.

On July 18, 2008, Baharestani met with Shahid and Charlene Shires, ZOLL's human resources officer. They presented Baharestani with a letter of termination.

d. Evidence Supporting Baharestani's Termination for Legitimate Reasons

There was significant evidence that ZOLL had legitimate reasons for terminating Baharestani that were unrelated to any product safety or testing integrity concerns raised by him. To be sure, Baharestani attempted at trial to discredit ZOLL's claims of alleged deficient performance through cross-examination of witnesses and by pointing out that there was no documentation of any criticism of his performance until the March 2008 performance appraisal. Nonetheless, there was substantial evidence from which a trier of fact could have reasonably concluded that Baharestani's substandard job performance—not voiced complaints and concerns about product safety and testing integrity—was a substantial motivating reason for ZOLL's termination of Baharestani's employment. Stated conversely, based upon the evidence presented by ZOLL, the jury could have reasonably concluded that Baharestani's raising of the above-referenced six safety/testing integrity issues was not the reason—or was at least not a substantial motivating reason—

25

for his discharge. Thus, the state of the evidence strongly suggests that ZOLL was prejudiced by the instructional error.

### 2. *Effect of other instructions*

There was no other instruction given by the court that in any way mitigated the instructional error. (See *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 429 [finding instructional error prejudicial, in part, because there were no clarifying or correcting instructions].) In fact, the court reiterated the erroneous instruction based upon the pre-*Harris* version of CACI No. 2430 in response to a question presented by the jury during deliberations. And the erroneous instruction was reinforced by the special verdict form that also contained the erroneous language.

### 3. *Effect of Counsel's Arguments*

The record does not disclose that argument by Baharestani's counsel contributed to the erroneous instruction by enunciating the improper standard. But ZOLL's counsel, in closing argument, stated that the issue for the jury to decide was whether "Baharestani's refusal to participate in providing false and misleading information to the FDA [was] a motivating reason for his termination." Defense counsel cannot be faulted for making this argument, however, since it was based on the instruction the jury had already been given. In light of the heightened burden of proof involved in the post-*Harris* instruction under CACI No. 2430, we infer that had the correct instruction been given, defense counsel would have argued that plaintiff was required to show that even if Baharestani's expressed safety and testing concerns were *a* motivating factor, Baharestani could not prevail unless he established that they were a *substantial* motivating reason for ZOLL's termination decision.

### 4. *Whether The Jury Was Misled.*

"A close verdict is a key indication that the jury was misled by an instructional error. [Citations.]" (*Whiteley*, *supra*, 117 Cal.App.4th at p. 665.) The jury verdict here was divided; 10 jurors voted in favor of the verdict and two voted against it. While this is

26

not as "close" as the 9-to-3 jury verdict in *Whiteley*, the vote, coupled with the fact that the jury asked three questions during deliberations—one of which asked for the meaning of "wrongful termination" that prompted the court to reiterate the erroneous portion of CACI No. 2430—indicates the jury was misled.  (Cf. *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 305-306 [fact that one juror voted against verdict found insignificant on the issue of prejudice].)

> *5.        The Instructional Error Was Prejudicial*

As noted above, there was a great deal of evidence presented below from which a reasonable trier of fact could have concluded that Baharestani's refusal to participate in providing false or misleading information to the FDA was *not* the reason, or at least was not a *substantial* motivating reason, for ZOLL's decision to terminate his employment. Viewing the evidence in a light most favorable to ZOLL (see *Freeze*, *supra*, 96 Cal.App.4th at pp. 52-53), as well as considering the other *Soule* factors, we conclude the instructional error here was prejudicial in that " 'it seems probable' that the error 'prejudicially affected the verdict.'  [Citations.]"  (*Soule*, *supra*, 8 Cal.4th at p. 580.)

In view of our conclusion that there was instructional error that requires reversal, we need not address ZOLL's second, alternative argument that the judgment must be reversed due to insufficiency of the evidence to support Baharestani's claim of wrongful termination in violation of public policy.

## DISPOSITION

The judgment is reversed and the matter is remanded for retrial.

_____
Márquez, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Grover, J.